

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-16-2008

# USA v. Hoffecker

Precedential or Non-Precedential: Precedential

Docket No. 06-3190

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Hoffecker" (2008). *2008 Decisions.* Paper 938.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/938

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 06-3190

———————

UNITED STATES OF AMERICA

v.

CHARLES PAUL HOFFECKER
also known as
CHIP HOFFECKER

Charles Paul Hoffecker,

                              Appellant

———————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Crim. No. 03-cr-00120-1)
Honorable Katharine S. Hayden, District Judge

———————

Argued March 6, 2008

BEFORE: FISHER, GREENBERG, and ROTH, <u>Circuit</u> <u>Judges</u>

(Filed: June 16, 2008)

———————

Christopher J. Christie
United States Attorney
Sabrina G. Comizzoli (argued)
Assistant U.S. Attorney
George S. Leone
Chief Appeals Division

Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102-0000

  Attorneys for Appellee

Susan Dmitrovsky (argued)
Sale & Kuhne
Law Office of Benedict P. Kuehne
100 Southeast 2nd Street
Bank of America Tower, Suite 3550
Miami, FL 33131-0000

  Attorneys for Appellant

---

OPINION OF THE COURT

---

GREENBERG, Circuit Judge.

## I. INTRODUCTION

Following his indictment on the charges a jury convicted Charles Paul Hoffecker of one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371 and three counts of mail fraud in violation of 18 U.S.C. § 1341. Based on these convictions, the District Court sentenced Hoffecker to a total custodial term of 210 months to be followed by three years of supervised release. Hoffecker appeals making the following claims: (1) the District Court erred in admitting the testimony of his former attorney; (2) the prosecution was time-barred; (3) the prosecutor engaged in prejudicial misconduct; (4) the District Court erred in its instructions to the jury; (5) a Government witness committed perjury; (6) the District Court erred in excluding expert witnesses; (7) the District Court erred in admitting evidence of a civil injunction entered against him; (8) the District Court erred in excluding his out-of-court statements; (9) the prosecutor made improper comments during closing argument; and (10) the District Court erred in calculating his sentencing guideline range and his

2

sentence is unreasonable. After our examination of all of these issues we have concluded that those concerning the testimony of his former attorney and the statute of limitations are the most significant and potentially of the greatest precedential importance. In the end, however, we reject all of Hoffecker's contentions and will affirm the amended judgment of conviction and sentence in this case entered July 24, 2006.

## II. FACTS AND PROCEDURAL HISTORY

After a conviction predicated on a jury verdict, we set forth the evidence in the light most favorable to the Government.[1] United States v. Wood, 486 F.3d 781, 783 (3d Cir. 2007). In November 1995, Hoffecker and his co-defendant Charles Edward Myers formed Amitex Investment Services Limited, Inc. ("Amitex"), a Bahamian corporation headquartered in Nassau, purportedly to sell physical commodities on a financed basis. It appears that Hoffecker contemplated that Amitex's customers who were actually its victims would be United States residents and, in fact, they were. Hoffecker owned 65% of Amitex, Myers owned 30%, and a third party, Walid El-Houri, owned the remaining 5%. Myers oversaw Amitex's daily operations while Hoffecker operated Amitex through daily phone contact and routine visits.

Hoffecker then incorporated Global Investment Corporation ("Global") in Florida in December 1995 but relocated Global to

---

[1]We are struck by the circumstance that Hoffecker's brief is detached from the realities of the case as it hardly makes reference to the facts that constitute the offenses involved and does not come close to setting them forth in a light favorable to the Government. This is unfortunate because the trial took more than two months and produced 61 volumes of appendices and supplemental appendices. In fact, after reading Hoffecker's brief one might wonder what had been going on here and what Hoffecker did to warrant his conviction. Fortunately, the Government's brief makes up for this shortcoming and neither the Government nor Hoffecker has been prejudiced by Hoffecker's brief's lack of factual detail.

Georgia in November 1996. Global was one of approximately ten "boiler-rooms" in which telemarketers sold the Amitex Leveraged Physical Commodity Investment Program ("LPCIP") to individual customers. Hoffecker owned and controlled Global, referred to himself as its "administrator," and took substantial amounts of money from Global in cash. His activities with respect to Global were extensive as he visited its offices, created promotional documents for its customers, hired its employees, presided over office-wide meetings and conference calls, brokered deals on its behalf, authorized its materials to be provided to third parties, and conducted sales presentations to the telemarketers.

Hoffecker instructed Global's telemarketers to represent to customers that the LPCIP would purchase actual tangible commodities on a customer's behalf, such as precious metals, gasoline, and heating oil, and store them outside the United States. The telemarketers also represented that the customers would pay for their purchases in part by using "loans" and "loan financing" that Amitex provided. Nevertheless, the LPCIP solicited a 20% down payment from its customers with the agreement that Amitex would advance the remaining 80% of the purchase price as a loan at 12% annual interest. Of course, inasmuch as Amitex did not purchase the commodities it hardly assumed a burden when it engaged itself to make these "loans."

The LPCIP was an elaborate and highly successful scam. Customers made down payments and were charged interest for the nonexistent fictional "loans" to purchase commodities that neither Amitex nor anyone else acting on its behalf bought or stored. Hoffecker enriched himself from the scam by siphoning off millions of dollars from Bahamian bank accounts that he had set up to conceal the fraud from United States law enforcement authorities.

Amitex's brochures and promotional materials falsely represented that Amitex was a legitimate operation, touting promises regarding its acquisition and storage of physical commodities, company history, account executives, office locations, and departments. A Global brochure extolled the investment's "tangibility," and represented that "the commodity [purchased would be] physically delivered to a lender for

4

safekeeping." App. vol. 25 at 35, 159. The brochure listed, with photographs, the types of commodities offered, including gold, silver, platinum, heating oil, unleaded gasoline, and foreign currencies.

Hoffecker instructed his telemarketers to emphasize to potential clients that the investment in physical commodities was safe and secure because it had "tangibility and liquidity," app. vol. 14 at 18, 31; vol. 25 at 159, and the commodities were "actually something you can hold and touch," app. vol. 17 at 86. Global's telemarketers and Global's account agreement represented that the commodities themselves secured the Amitex loans and were being held by Amitex as collateral in insured storage facilities outside the United States.

In addition, Amitex sent investors a brochure touting its "third party storage" facility. App. vol. 14 at 31; vol. 17 at 67. It also advised customers that there was a storage fee, but that this fee currently was not being charged. This aspect of the fraud was significant as one customer thought of the fee waiver as a "great perk." App. vol. 26 at 44.

In reality, neither Amitex nor Global purchased or stored physical commodities. In fact, Amitex did not have the physical capability to store the physical commodities, and a Government expert testified that the promise to "hold" and "store" several of these commodities physically could not be fulfilled. In this regard, as an example of Amitex's inability to store the commodities, heating oil and unleaded gasoline degrade and/or become contaminated over a period of months, becoming unsalable.

Hoffecker falsely created the image that Global and Amitex were thriving worldwide entities. Amitex's brochures touted Walid El-Houri as the original founder of Amitex and claimed that Amitex had a 25-year history and had generated "several billion dollars" from its global ventures, including worldwide oil and other commodity transactions. App. vol. 25 at 164; vol. 17 at 60-69. Hoffecker instructed his telemarketers to emphasize Amitex's "billions" of dollars of business to demonstrate that Amitex was a large company which its clients could trust. App. vol. 17 at 62-63.

These representations were false. El-Houri was not an original founder of Amitex; rather, he was briefly a 5% owner who ceased his involvement with Hoffecker and Amitex only a few months after its inception. El-Houri's attempt to extract himself from Amitex culminated in Amitex's agreement on March 5, 1996, at El-Houri's insistence to destroy all marketing brochures and public relations documents portraying him as a major principal in Amitex. This agreement was, however, as worthless as all of Amitex's other undertakings as it continued to send its customers brochures throughout 1996 and 1997 touting El-Houri as the original founder of Amitex.

Of course, Amitex did not generate "several billion dollars" over its supposed 25-year history. Amitex opened for business in November 1995 and did no significant business prior to issuing the brochure touting its 25-year history. Contrary to representations contained in its brochures, Amitex was not engaged in any global business ventures involving worldwide oil transactions, international business transactions, or financing of major global projects. Moreover, though Amitex brochures and envelopes represented that it had offices in the Bahamas, London, Munich, and Monaco,[2] its only office was in the Bahamas.

Amitex's and Global's written materials and telemarketers referenced various departments within the companies, such as Amitex's "New Accounts Department," "Customer Service Department," "Traders," and "Compliance Department." App. vol. 14 at 72, 160; vol. 21 at 34-36, 93-94. These departments, however, did not exist. Amitex's staff consisted of approximately five Bahamian office workers, whom Hoffecker described as "back office" types who performed clerical and administrative tasks. Supp. app. at 22. Thus, contrary to the brochures' representations, Hoffecker's staff did not have "extensive international business expertise," "worldwide contacts," or "a network of professional men and women who have the uncompromising commitment, integrity and motivation to achieve success." App. vol. 21 at 73-74.

---

[2]The term Monte Carlo actually was used.

Global similarly represented that it had a "Trading Department," "Compliance Department," and "Compliance Director." App. vol. 24 at 109, 111, 122. In reality, Global did not have a Trading Department and its so-called Compliance Department consisted of one person, the Compliance Director, Francine Leone, who was a secretary who performed clerical and administrative tasks. Leone testified that she had no training or expertise in compliance-related matters, and did not interact with any in-house or outside legal counsel. Her alleged compliance-related duties were nothing of the kind as they consisted of reading a short script to prospective investors. If Leone was unavailable to read the script, other Amitex telemarketers would read it for her. Leone spoke to virtually every Global customer on the telephone throughout 1996. Her script advised the customer: "I will go ahead and execute your trade . . . ." Supp. app. at 42. But in reality neither Global nor anyone else made the claimed trades or purchases. As Leone testified at trial, Global's Compliance Department was nothing more than an "illusion." App. vol. 24 at 124.

Global also sent the customers a brochure representing that Global's "account executives" had the requisite "expertise and resources to guide and assist you in your journey through the financial arena." Id. at 91-92. In reality, however, Global hired telemarketers without requiring any professional credentials or expertise other than that they had to be "good talkers." Id. at 101. Global's on-site manager, Jayson Kline, had followed Hoffecker from his previous business ventures. Kline and other Global telemarketers previously had lost their licenses to sell commodities futures and options (though no license was required to sell "physical" commodities).

Hoffecker's scheme further involved duping customers with written statements "confirming" trades and monthly account statements. Thus, after each supposed purchase of a physical commodity, Global sent the customer a written "Confirmation Statement," confirming that the customer "bought" a specified quantity of a specific physical commodity at a specific price. App. vol. 14 at 67. The written confirmation contained a "Trade Date" and a "Loan Amount" and reflected the customer's 20% down payment. App. vol. 26 at 21-22. Amitex subsequently sent the

7

customers monthly account statements confirming the alleged loans, the purchase of products, and the monthly interest charged.

Hoffecker fraudulently represented to customers that Amitex and Global were "separate," "independent," and "not-related" to each other. In furtherance of this false representation Hoffecker created a Global brochure representing that Global and Amitex were "independent" of each other. App. vol. 14 at 81. An Amitex promotional brochure referred to itself as the "independent lender" and to Global as the "independent broker dealer." Id. Global's written Risk Disclosure Statement represented that Amitex and Global were "separate" and "nonrelated," that the investor was "independent of your broker, Global Investment Corp., entering into a collateral loan transaction with a separate non-related financial institution [Amitex]." Id. at 50-53, 82. Amitex's Terms and Conditions booklet, which Hoffecker approved, made approximately a dozen representations that Global was "independent" and "not agents, employees, or affiliates of Amitex Investment Services, Ltd." Id. at 80. Amitex and Global were, of course, not "separate," "independent," or "nonrelated." Rather, Hoffecker co-owned and controlled Amitex while simultaneously co-owning and controlling Global, although he attempted to conceal his ownership of both companies.

Hoffecker attempted to achieve plausible deniability by placing a fraction of the customers' funds in a supposed hedge fund account called "Phoenix," located in the Turks and Caicos Islands, so that when customers eventually realized they were losing all, or almost all, of their money, he could point a finger at the separate hedge fund for the loss. Hoffecker at no time after Amitex and Global ceased operations attempted to use the money he had sent to Phoenix to compensate any customers for their losses. Moreover, neither Hoffecker nor anyone else ever apprised any customer of the so-called hedging.

Hoffecker and his entities routinely "reloaded" customers, meaning that they subjected them to multiple solicitations for additional investments after the initial solicitation on the logical theory that a customer swindled in the first place was a likely mark for a repeat performance. As examples of reloading, all of the four victims who testified at trial made a series of purchases. There

8

were taped conversations in evidence at trial revealing Hoffecker discussing the "loading" of customers, which further depleted their "equity." In recorded conversations, Hoffecker's co-conspirator, Myers, referred to the Amitex-Global victims as "bullion heads – I call them bullion heads – I don't know what the fuck else you'd call 'em. . . . They just like to buy this shit." Supp. app. at 21.

Global employees testified that, to their knowledge, none of the Global customers made a profit. As former Global employee Gregory Swarn testified, consistently with the testimony of the four victims, no Global client ever made a profit, most lost everything, and some were returned remittances of a small fraction of their investment in order to lull them into believing that their losses were attributable to the marketplace and not to fraud. Moreover, Myers admitted in recorded conversations, "I'll make the, the price up, so at least he's [the victim] got enough to take his wife out to dinner. . . . I mean that's just the cost of doing business." Id. at 13. Myers explained that he preferred to remit a small fraction to the customer as soon as possible, preferably within 24 hours:

> The reason for it is we want them to die as quick a death as if they're dying get them out of the way. We do not want them calling you up saying how come that son of bitch doesn't send me my money. . . . You're a thief and a crook cause you don't send me my money. We don't want that [to] occur. We want to get that money to him immediately so he can take his wife out to dinner and it's all over with.

Id. at 29.

Global, reflecting Hoffecker's indifference to the interests of its victims, cynically targeted senior citizens and other persons unsophisticated in investments. Clearly, of course, Global had to target such vulnerable persons to be its victims as any reasonably sophisticated investor who checked up on Amitex and Global with financial services reporting agencies quickly would have discovered that the scheme was a fraud. As an example of the type of victim the scheme targeted, a boiler room employee solicited Geraldine Conover, an 82-year-old mid-western great-great grandmother in mid- to late-1995. Ms. Conover ultimately

9

invested approximately $125,000 in the scheme and lost it all. After a telemarketer solicited her more than 20 times in one day, Ms. Conover contacted law enforcement authorities who requested that she record her telephone conversations with both the boiler-room solicitors and Amitex. In a recorded conversation on April 25, 1996, Ms. Conover expressed to the telemarketer her concern about Amitex because she was "naive" and had invested a lot of money, and the paperwork "didn't really say who owned [Amitex]." Id. at 115. The telemarketer repeatedly assured her that Amitex had been in business for "many, many years," id. at 114, and that Ms. Conover could confirm this with Amitex's written information packet that described "their history," id. at 116. Ms. Conover also recorded a conversation she had with Myers in which Myers made a series of incriminating admissions regarding the promised purchase of physical commodities, the purported loans and interest charged for them, and the supposed storage of the commodities.

Harriet Davis, another victim, was a 75-year-old widow on a fixed income who invested with Global and Amitex. She told a Global telemarketer that she was comfortable investing $5,000. Over a span of a few months, however, and after calling her every day or every other day, Global and Amitex swindled her out of approximately $43,000. She eventually received a remittance of $4,039. Stephen Miller invested $77,152 and received a remittance of $7,488. Marie Walsh invested approximately $70,000 and lost the entire amount.

Between 1996 and 1997, Amitex/Global defrauded more than 600 victims of at least $14,151,596 by pocketing their investments and interest payments and charging a 15% sales commission, $100 new account fee, $100 annual fee, and a "spread fee" of approximately 3% of the total value of the investment (the 20% down payment plus the 80% financing). Because Amitex/Global did not purchase or store anything, and there were no actual loans, all of these fees and commissions were merely additional means to bilk the victims. Even as experienced federal judges who naturally are not easily surprised by the evil that people will do, we are stunned by the scope of the fraud here.

Hoffecker siphoned off much of the scam's proceeds.

Indeed, early on in the scheme, Hoffecker told Jack Field, the Government's confidential informant who, as we will explain, is a central figure in this case, that Hoffecker was "on target" to receive "at least" $40,000 to $60,000 per month from the hoax. Supp. app. at 27b. Throughout the life of the ruse, Global employees regularly handed Hoffecker thousands of dollars in cash, sometimes as often as three times a week. To conceal his money, Hoffecker kept one million dollars in cash in the name of an alias in a Fort Lauderdale bank vault. In addition, Hoffecker transferred more than two million dollars from Amitex's bank account in the Bahamas to his personal off-shore bank account. Hoffecker siphoned off this money, taking hundreds of thousands of dollars in cash outright, and funneled the remainder to other off-shore accounts for other businesses he operated.

Hoffecker's telemarketers solicited customers from 1996 through 1997 until, with no advance notice, in an unsigned letter dated December 24, 1997, Global advised its customers that it was going out of business effective December 31, 1997, and that Amitex would handle its accounts. Customers were informed that they could register any complaints regarding Global's closure to Amitex's non-existent "Compliance Department." App. vol. 14 at 160.

Amitex abruptly closed down a few months later, effective March 31, 1998, and, like Global, did so without advance notice. A Bahamian company called "International Bullion Services" ("IBS") advised Amitex customers in an unsigned letter which did not reference Amitex that it purchased their assets and loans. In fact, Hoffecker paid IBS $400,000 to take Amitex off his hands. Overall, after our intense study of this case and taking into account our extensive experience in dealing with thieves, swindlers, confidence men, charlatans, and the like, we conclude that Hoffecker ranks high in the pantheon of thieves. He is utterly devoid of principles.

On February 14, 2003, a grand jury indicted Hoffecker and Myers on charges of mail fraud and conspiracy to commit mail and wire fraud. Their first trial commenced on June 3, 2004, and concluded with a hung jury on August 13, 2004. Their retrial began on January 3, 2006, and resulted in the jury returning guilty

verdicts on March 17, 2006, convicting Hoffecker and Myers of one count of conspiracy to commit mail or wire fraud and three counts of mail fraud. Following the jury verdict, Hoffecker unsuccessfully moved for a judgment of acquittal or a new trial. The District Court ultimately sentenced Hoffecker to 210 months of imprisonment to be followed by a three-year term of supervised release and sentenced Myers to 108 months of imprisonment to be followed by a term of supervised release. Hoffecker but not Myers appeals.

The district court had jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## III. DISCUSSION

As we set forth above, Hoffecker has raised a variety of challenges to his conviction and sentence. We shall consider each argument in turn. Significantly, however, Hoffecker does not contend that the evidence did not justify the verdict.

1. Use of Hoffecker's Former Lawyer as a Government Witness

Hoffecker argues that the Government's conduct in using Jack Field, his one-time attorney, as an informant was so outrageous that it violated the Due Process Clause of the Fifth Amendment to the Constitution and that the District Court erred when it rejected his requested jury instruction on the defense of reliance on advice of counsel.

Field was Hoffecker's long-time friend and former business associate. Indeed, in July 1990, Field was his substitute counsel of record in a Federal Trade Commission ("FTC") action, FTC v. Uni-Vest Financial Services & Charles P. Hoffecker, et al., No. 89-6382 (S.D. Fla.), which was filed in 1989 and was settled on July 15, 1991. But Field was only one of Hoffecker's attorneys as he was sued in over 100 other actions brought by the National Futures Association ("NFA") and the Commodity Futures Trading

12

Commission ("CFTC"), and he hired attorneys other than Field to represent him in those cases.

In June 1996, Field reestablished contact with Hoffecker so that he could serve as a confidential informant for the Government. This initiation of contact from the outside of the current relationship between the confidential informant, Field, and the defendant, Hoffecker, gave the Government and the informant the opportunity to ensure that the informant kept his legal activities out of his dealings with Hoffecker, and Field and the Government took full advantage of this opportunity. Moreover, before this reunion, Field and Hoffecker essentially had been out of contact for approximately three years, a lapse of time that assisted Field in renewing their relationship on a basis other than that of an attorney and client. During their first renewed encounter, the two discussed a potential business arrangement involving the Amitex scheme:

> Hoffecker: Jack, I would like to do some business with you.
>
> Field: I'd like to do that, too.

Supp. app. at 2. Later that same day, Field rejected any suggestion that he would be serving as an attorney to Hoffecker, Myers, Global, or Amitex:

> Field: . . . I'm sure I don't want to be a lawyer on this.
>
> . . . .
>
> Hoffecker: Okay. Okay.
>
> Field: I can find you. I know a good law firm over there.
>
> Hoffecker: . . . You don't have to be a lawyer on this, you could be a contributor, partner, a uh you know.
>
> Field: Consultant.

13

| | |
|---|---|
| Hoffecker: | Yeah. |
| Field: | Business consultant. |
| Hoffecker: | Oh, yeah. |
| Field: | Business advisor. |

Id. at 5. Excerpts from subsequent taped conversations demonstrate that Hoffecker and Field both understood that Field was not serving as a lawyer for Hoffecker or his entities. In fact, on each occasion that Field made this clear, Hoffecker responded by indicating that he understood. See, e.g., id. at 26 (Field: "I just want to try and put a deal together so I don't practice law anymore." Hoffecker: "Right, I understand."); id. at 27d (Hoffecker: "[Y]ou are a business man . . . . You're not a lawyer any more."); id. at 33b ("Field: "I don't want to get involved in giving legal advice." Hoffecker: "I understand."). Hoffecker indicated that he was obtaining legal advice elsewhere.

Instead of doing legal work, Hoffecker wanted Field to be a recruiter, setting up telemarketing boiler-rooms in the United States to solicit potential customers and generate income for Amitex and Global, for which Field would be paid a commission:

| | |
|---|---|
| Hoffecker: | . . . [Y]ou, at this stage of the game can get involved in us, it's two ways, one at the legal side, and the other . . . . |
| Field: | [Unintelligible.] |
| Hoffecker: | Getting involved in dealer networking with us. That's where the money is. |
| Field: | Okay. Okay. I don't want to do any, any legal work. |

Id. at 23-24.

| | |
|---|---|
| Hoffecker: | My thought was that basically what I |

14

would do, is I would put together a retail sales organization and that I would get someone like Jack [Field] or get Jack to be involved from a, uh, you know a business side. Where Jack could go out and hustle dealers, and sellers, basically.

Id. at 33.

Hoffecker arranged to compensate Field based on the interest charges generated from the purported loans Amitex extended to its customers, as well as the fees for the purported purchase and sale of physical commodities in the boiler-rooms Field set up. In short, Hoffecker and Field understood that Field would derive his compensation exclusively from the business he generated, apparently on the theory that you eat what you kill. Thus, Field did not receive a legal retainer or have a fee arrangement with Hoffecker or Amitex, and Hoffecker never paid Field for any legal services in the Amitex-Global scheme.

During the course of the investigation, the Government, which was aware of the potential attorney-client relationship problem, instructed Field to state to Hoffecker clearly and repeatedly that he was not serving as legal counsel to Hoffecker or others. Hoffecker inadvertently accommodated the Government by repeatedly affirming his understanding that Field was serving as a business associate and not as legal counsel. Government investigators ensured that Field's prior legal work would not become implicated in the case by not inquiring about any previous privileged communications between Field and Hoffecker and by instructing Field not to divulge any potentially protected previous communications. To further ensure that such communications were not divulged, the Government employed a "taint team" to review all of the recorded conversations between Field and Hoffecker.

Before the first trial, Hoffecker moved to dismiss the indictment based on his claim that the Government had engaged in

15

outrageous conduct. In the alternative, Hoffecker moved to suppress evidence of his conversations with Field. After several days of hearings, the District Court issued oral and written findings that there had not been an attorney-client relationship between Field and Hoffecker and denied Hoffecker's motions.

We review the District Court's rulings on the outrageous conduct claim recognizing that "[b]ecause outrageous government conduct, a constitutional claim, is a mixed question of law and fact, '[w]e exercise plenary review over the district court's legal conclusions, and review any challenges to the court's factual findings for clear error.'" United States v. Lakhani, 480 F.3d 171, 181 (3d Cir. 2007) (second alteration in original) (quoting United States v. Nolan-Cooper, 155 F.3d 221, 229 (3d Cir. 1998)). We also are aware that we repeatedly have noted that we are "extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." United States v. Voigt, 89 F.3d 1050, 1065 (3d Cir. 1996). The Government's conduct can be regarded as so offensive that it requires the dismissal of an indictment only if it is "most intolerable." United States v. Jannotti, 673 F.2d 578, 608 (3d Cir. 1982). Thus, a court should not dismiss an indictment "'each time the government acts deceptively or participates in a crime that it is investigating.'" Nolan-Cooper, 155 F.3d at 231 (quoting United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992)).

To elevate a violation of the attorney-client privilege to a constitutional claim of outrageous misconduct, a defendant must demonstrate "(1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice." Voigt, 89 F.3d at 1067 (footnote omitted).

The District Court found that the Government did not engage in outrageous conduct because there was not an attorney-client relationship between Field and Hoffecker at the time of the investigation when Field was pursuing his confidential activities. Accordingly, the relationship between Hoffecker and any person or entity involved in this case and Field could not satisfy the first Voigt requirement for a finding of outrageous misconduct. Indeed,

16

the court stated that "there barely was a former relationship in the traditional and understood sense of attorney-client . . . ." App. vol. 8 at 35. The court found that "the government was well aware of a potential attorney-client relationship problem, took steps to avoid it, or screen for it." Id. at 37-38. Accordingly, the court found that "notwithstanding a prior attorney-client relationship, Field could nonetheless be a government informant without running afoul of attorney-client law." Id. at 34. The court found that the recorded conversations among Hoffecker, Field, and others occurred in the context of "build[ing] Field into the existing business entity," id. at 12, and establishing Field as a business associate who would help Amitex establish sales rooms, from which Field would earn a commission. The court further found that Hoffecker could not have had any objectively reasonable understanding that Field was functioning as his attorney. The court found that, instead, Hoffecker's "objectively reasonable understanding" was that Field was his "business partner," who would be compensated as a "business co-venturer, and that Field would not be taking the legal end, but rather the networking room related end . . . ." Id. at 34. The court noted that "[i]t would be clearly unreasonable for Hoffecker to believe, based upon what was said, that Field was his lawyer. Hoffecker made it clear he had lawyers." Id. at 34. Accordingly, the court found that Hoffecker had not shown that the Government's conduct was outrageous.

Notwithstanding the voluminous evidence showing that Field repeatedly told Hoffecker that he did not want to act as his lawyer, Hoffecker contends that there was an attorney-client relationship between him and Field during the Government's investigation and points to a number of snippets of conversation between the two men that he contends support his claim. For example, Hoffecker claims that "Field acknowledged Field's role as a 'legal counsel or legal consultant . . . .'" Appellant's Br. at 21. In context, however, Field actually was making clear that he was not serving as Hoffecker's legal counsel:

> Hoffecker:  So, basically, if we, if you could get us some rooms and we could use, you know, have you as a, as a, a legal counsel or, or legal consultant, let's say . . . .

17

Field:          As a business consultant. I don't want to, I don't want to do law practice. I don't want to do legal shit.

Hoffecker:      A business consultant from a, from a legal standpoint.

Field:          I can business consult on what I think is the way to set it up and ways to set it up. That's just from strictly business side. Once it's set up, you probably need somebody to look at it and give you an opinion letter.

Hoffecker:      Right.

. . . .

Hoffecker:      . . . [W]ell you can call it business consulting, you can call it legal consulting, I don't care what you call it, you know I mean we know that you have a legal mind that's, that's one of the better ones so we understand that that's, that, that any kind of business consulting see would be from a legal twist, I'm sure.

Field:          It would be from my background experience but it wouldn't be real legal advice, I just, I just don't want to get in that box, frankly. I don't like doing that, I've done it too damn long, and I don't want to be limited in making money to what lawyers' fees are.

Hoffecker:      I see.

18

Supp. App. at 17-18. The other pieces of conversation that Hoffecker cites as support for his claim of outrageous Government conduct similarly do not support his claim and, when viewed in context, instead refute it and we see no reason to recount them here.

Hoffecker also claims that the declaration of Christopher Holly "confirms" Field's status as a lawyer for Hoffecker. In fact, Holly merely stated that he was present on five or six occasions between June 1993 and May 1995 when Field and Hoffecker purportedly had phone conferences involving a CFTC case against Hoffecker. Holly's declaration does not mention specific subjects discussed, but generally states that Field offered legal advice to Hoffecker in these 1993-1995 conversations. The District Court found that Holly, like other persons surrounding Hoffecker, used Field as a "strategist," but that use did not create an attorney-client relationship between Field and Hoffecker during the 1993-1995 period, let alone when Field cooperated with the Government in 1996-1998. The District Court's finding surely is unassailable under any standard of review.

Hoffecker next claims that the testimony of John Leubsdorf, who was qualified as a professional responsibility expert, demonstrates that Field's and Hoffecker's interactions "impacted" on an existing legal representation. Appellant's Br. at 24. In analyzing Leubsdorf's testimony, however, the District Court noted that even Leubsdorf would agree that the professional responsibility rules do not apply in the absence of an attorney-client relationship. Because a past attorney-client relationship does not establish that an attorney-client relationship continues until a later time, United States v. Evans, 113 F.3d 1457, 1463 (7th Cir. 1997), Hoffecker's claim only can succeed if he shows that he and Field had an attorney-client relationship between 1996 and 1998.

Even if we exercised plenary review of all aspects of Hoffecker's outrageous conduct claim, we would conclude that the District Court correctly determined that Hoffecker and Field had a business relationship, not an attorney-client relationship, during the Government's investigation when Field was acting as its informant. Indeed, we cannot help but wonder why Field's extraordinary efforts to keep an attorney-client relationship out of his dealings

19

with Hoffecker did not cause such an experienced confidence man to be suspicious of Field but apparently they did not.

Surely there is a delicious irony in the circumstance that Field and the Government conned the con man. Overall, to call the evidence supporting Hoffecker's claim "thin" would be generous as "microscopic" would be the more appropriate word. There was no evidence showing that Field acted as Hoffecker's attorney; in fact, at every opportunity Field reminded Hoffecker that he was <u>not</u> his attorney and did not want to be his attorney. Their relationship during the Amitex investigation was not that of an attorney and a client, and did not come close to being one. Hoffecker has not shown that Field acted as a legal advisor to him, Amitex, or Global, or that it was reasonable for Hoffecker to believe that Field was acting as his attorney. Accordingly, we conclude that that the Government's investigation did not interfere with an attorney-client relationship between Hoffecker and Field as there was no relationship with which to interfere and therefore the District Court properly denied Hoffecker's motion to dismiss the indictment or suppress evidence.

We next consider whether the District Court erred in refusing to give a jury instruction on the defense of reliance on advice of counsel that Hoffecker requested. We consider this point on an abuse of discretion basis. <u>See</u> <u>United States v. Leahy</u>, 445 F.3d 634, 642 (3d Cir. 2006). Certainly a district court is "bound to give the substance of a requested instruction relating to any defense theory for which there was any foundation in the evidence." <u>United States v. Blair</u>, 456 F.2d 514, 520 (3d Cir. 1972). But a court

> also ha[s] to avoid diverting the jury by idle speculation and frivolous considerations. A confused jury can give as improper a verdict as one which has failed to receive some significant instruction. Therefore, the charge should direct and focus the jury's attention on the evidence given at trial, not on far fetched and irrelated ideas that do not sustain a defense to the charges involved.

<u>Id.</u> (citation omitted).

20

There was no evidence that Hoffecker and Field had an attorney-client relationship between 1996 and 1998, or that Field gave him legal advice, on which Hoffecker relied. As the District Court found, Hoffecker's argument that Field "performed a legal function" was "specious." App. vol. 53 at 84. Inasmuch as there was no evidentiary support for the instruction, the court correctly did not give the instruction which would have been unjustified and confusing to the jury. Accordingly, the District Court did not abuse its discretion when it rejected Hoffecker's requested advice of counsel instruction. Indeed, it would have been legal error for the court to have given the charge and thus, even on a plenary review basis, we would reach the same result that we reach on this point.

2. Statute of Limitations Issues

Hoffecker next raises statute of limitations issues, primarily with respect to the mail fraud charges in Counts Two and Three of the indictment and the conspiracy to commit mail and wire fraud charge in Count One, though he does contend that the statute of limitations should have barred this entire case. These issues, as will be seen, potentially raise the most far-reaching precedentially significant legal matters on this appeal, but in the end the application of conventional principles controls them.

The statute of limitations requires that indictments for mail fraud and for conspiracy to commit mail and wire fraud must be "found" within five years of the commission of the offenses. See 18 U.S.C. § 3282(a). "An indictment is found when it is returned by a grand jury and filed." United States v. Oliva, 46 F.3d 320, 324 (3d Cir. 1995). The statute begins to run for mail fraud when a defendant "places, deposits, causes to be deposited, takes, or receives mail, or knowingly causes mail to be delivered, as part of the execution of a scheme to defraud," United States v. Pharis, 298 F.3d 228, 234 n.3 (3d Cir. 2002) (citation and quotation marks omitted), and for conspiracy when the conspirators commit the last overt act in furtherance of the conspiracy, United States v. Jake, 281 F.3d 123, 129 n.6 (3d Cir. 2002).

There is, however, a critical variation in the calculation of the limitations period when the Government requests assistance

from a foreign country to gather evidence of offenses for in such situations it can apply to a district court to enter an order suspending the running of the statute of limitations pursuant to 18 U.S.C. § 3292 which provides:

> (a)(1) Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country. (2) The court shall rule upon such application not later than thirty days after the filing of the application.

> (b) Except as provided in subsection (c) of this section, a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.

> (c) The total of all periods of suspension under this section with respect to an offense – (1) shall not exceed three years; and (2) shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section.

> (d) As used in this section, the term 'official request' means a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country.

Congress enacted section 3292 in response to "[t]he use of offshore banks to launder the proceeds of criminal activities and to evade taxes," which "ha[d] become an increasing problem for federal prosecutors." H.R. Rep. No. 98-907, at 2 (1984), reprinted in 1984 U.S.C.C.A.N. 3578, 3578. Congress explained that:

> Once funds are traced to offshore banks, federal prosecutors face serious difficulties in obtaining records from those banks in both the investigative and trial stages of a prosecution. . . . The procedures that must be undertaken in other countries in order to obtain the records generally take a considerable period of time to complete. . . . If the records are essential to the bringing of charges, the delay in getting the records might prevent filing an information or returning an indictment within the time period specified by the relevant statute of limitation.

Id. at 2-3, reprinted in 1984 U.S.C.C.A.N. 3578, 3578-79.

The indictment charged Hoffecker with three counts of mail fraud and one count of conspiracy to commit mail and wire fraud. The mail fraud charged in Count Two was based on a mailing sent on June 23, 1997, the mail fraud charged in Count Three was based on a mailing sent on August 31, 1997, and the mail fraud charged in Count Four was based on a mailing sent on March 4, 1998. The last overt act in furtherance of the conspiracy charged in Count One was the March 4, 1998 mailing. Thus, absent a suspension of the statute of limitations, the Government was required to obtain indictments against Hoffecker no later than June 23, 2002, on Count Two, August 31, 2002, on Count Three, and March 4, 2003, on Counts One and Four.

On March 13, 2002, before the statute of limitations had expired on any of these offenses, the Government sought assistance from the government of the Bahamas to obtain Amitex's banking records invoking a Mutual Legal Assistance Treaty. Nearly eight months later, on November 5, 2002, the Bahamas sent the Government a portion of the requested documents.

On December 23, 2002, after the statute of limitations absent suspension would have expired on Counts Two and Three but before it would have expired on Counts One and Four, the Government applied ex parte to the grand jury supervising judge to suspend the statute of limitations pursuant to section 3292 for the 238-day period between March 13, 2002 and November 5, 2002. The court granted the application and ordered a 238-day suspension. The grand jury then indicted Hoffecker on Counts One through Four on February 14, 2003. Clearly if the 238-day period is excluded the entire indictment on its face was timely.

Hoffecker nevertheless contends that the conspiracy charge in Count One was untimely because the March 4, 1998 mailing was not in furtherance of the conspiracy and thus the last overt act of the conspiracy occurred more than five years before the indictment was found. Accordingly, he argues that we should dismiss Count One because the District Court did not instruct the jury on the limitations defense. Of course, this argument applies to Count Four as well.

Hoffecker also argues that we should dismiss the mail fraud charges in Counts Two and Three on the basis of the Government's application to suspend the running of the statute of limitations having been improper (1) because the proceeding before the grand jury judge was ex parte; (2) the Government filed the application after it had received all of the evidence from the Bahamas; and (3) the Government filed the application after the statute of limitations already had expired on the mail frauds charged in Counts Two and Three.

Before we can consider these claims on their merits, however, we must address the procedural question of whether Hoffecker has waived any of the issues he now advances for purposes of this appeal. There are two ways by which Hoffecker could have waived his claims: failing to raise an issue in the District Court before or at trial, see United States v. Karlin, 785 F.2d 90, 92-93 (3d Cir. 1986), or failing to identify or argue an issue in his opening brief on appeal, see United States v. Pelullo, 399 F.3d 197, 222 (3d Cir. 2005).

To consider the waiver issue, we have delved intensely into

the procedural history of the case by studying its massive record. Before Hoffecker's first trial, he moved to dismiss the indictment as untimely. See Supp. app. vol. 61 at 1-15. In that motion, he argued that the conspiracy charged in Count One was untimely because the indictment was found more than five years after the final overt act of the conspiracy. Hoffecker also argued that the Government's ex parte section 3292 suspension application was improper and the District Court should have required the Government to reveal to him the documents relevant to its application. Finally, Hoffecker stated:

> The court suspended the statute of limitations from March 13, 2002 to November 5, 2002, a period of some seven months. The order did so after the stated period had already elapsed, in contravention with the statutory language that permits suspending 'the running of the statute of limitations . . . .' Once the specific period has already run, an extension order that attempts to reach back into time is inconsistent with the statutory authorization.

Id. at 12-13. Clearly Hoffecker intends this paragraph to correspond with his argument that the Government's section 3292 suspension application was improper because the Government filed it after the statute of limitations had expired on Counts Two and Three. Significantly, however, in his motion Hoffecker did not contend that the Government did not move properly to suspend the statute of limitations pursuant to section 3292 because it filed the suspension application after receiving all of the evidence from the Bahamas. After oral argument, the District Court denied the motion. App. vol. 2 at 1-26. The case then proceeded to trial and, as we stated above, ended in a mistrial.

After the mistrial but before the retrial, we filed our opinion in United States v. Atiyeh in which we held that a district court may not suspend a statute of limitations pursuant to section 3292 when the Government applies for suspension after it already had received all requested foreign evidence. 402 F.3d 354, 362-67 (3d Cir. 2005). Hoffecker, however, did not renew his motion to dismiss the indictment on statute of limitations grounds after the mistrial and he did not bring Atiyeh to the District Court's

attention. Hoffecker, however, did request a jury instruction on the statute of limitations defense at the second trial. The District Court rejected this request.

We find that because Hoffecker did not at any time in the District Court contend that the Government's suspension application was improper because the Government filed the application after it had received all of the evidence from the Bahamas, he has waived the issue. See Karlin, 785 F.2d at 92-93. In this regard we point out that in Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am. we indicated that "[i]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument." 927 F.3d 1283, 1298 (3d Cir. 1991); Jake, 281 F.3d at 129 ("the statute of limitations is an affirmative defense that is waived unless properly preserved").

In any event, even if we held that Hoffecker had not waived this issue, we would not dismiss Counts Two and Three on Hoffecker's theory that the Government filed its suspension application after it received all the requested evidence from the Bahamas. In Atiyeh we determined that under section 3292 the Government must indicate in its application that the evidence is in a foreign country at the time of the application, and thus the Government must file its application with the grand jury judge before the Government "has received all requested foreign evidence from foreign authorities . . . ." 402 F.3d at 362. In that case, the Government's section 3292 application represented that it had received "all" of the requested foreign evidence at least two months before it applied to the grand jury judge to suspend the statute of limitations, and the application "did not precisely state that evidence of offenses 'is in a foreign country.'" Id. at 362-63. Because in Atiyeh the Government in its application failed to make the required assertion and filed its application after it had received all of the requested documents, we dismissed as time-barred several counts on which the statute of limitations had run.

In this case, by contrast, the Government filed its suspension application after receiving some, but not all, of the requested foreign evidence from the Bahamas. As the testimony of both Government and defense expert witnesses confirmed, the Bahamian bank documents sent to the Government were substantially incomplete. Moreover, the Government never

26

represented in its suspension application that it had received "all" of the evidence or that evidence was no longer in the Bahamas. According to the Government, the application stated that "[t]he undersigned [AUSA] believes that evidence of the indictable offenses presently being investigated is located in a foreign jurisdiction." Appellee's Br. at 53 (alterations in original). Thus, the Government's application here is unlike the application that fell short in Atiyeh. Because the Government applied to suspend the statute of limitations before it received all of the evidence from the Bahamas and stated in its application that it believed that evidence of the offenses "is" located in the Bahamas, we would not dismiss Counts Two and Three on the basis of Atiyeh even if Hoffecker had preserved the issue for appeal. Finally on this point we mention the obvious: it does not matter whether the Government receives any additional materials after it makes its request to the foreign country. The question is whether at the time of its application to suspend the running of the statute of limitations the Government had received all the requested documents that were in the foreign country.[3]

_____

[3]Although our opinion in Atiyeh primarily involved the proper interpretation of section 3292(a)(1), which is concerned with when a request for suspension of the running of the statute of limitations must be made, we also indicated that when the Government "has received all requested foreign evidence from foreign authorities" there has been final action within section 3292(b) dealing with the period of the suspension. 402 F.3d at 362-63. It is appropriate for us to comment further on the meaning of final action within section 3292.

We reiterate that unlike section 3292(a)(1), which sets out the timing requirements for the Government to make its application to suspend the statute of limitations and the findings that the district court must make before it grants the application and does not use the term "final action," section 3292(b) is concerned with the start and end dates for the period of suspension after the court grants the Government's application. It states in pertinent part that the period of suspension "shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request." 18 U.S.C. § 3292(b). Of course,

section 3292(c) places a further limit on the length of the period of suspension: "[t]he total of all periods of suspension under this section with respect to an offense . . . shall not exceed three years . . . ."

Other courts of appeals have concluded that the "final action" for purposes of section 3292(b) occurs when the foreign authority makes a dispositive response to each of the items listed in the government's official request. See United States v. Hagege, 437 F.3d 943, 955 (9th Cir. 2006) ("'[F]inal action' for purposes of § 3292 means a dispositive response by the foreign sovereign to both the request for records and for a certificate of authenticity of those records, [when] both [a]re identified in the 'official request.'" (second and third alterations in original) (quoting United States v. Bischel, 61 F.3d 1429, 1434 (9th Cir. 1995)); United States v. Torres, 318 F.3d 1058, 1065 (11th Cir. 2003) ("'[F]inal action' for the purposes of § 3292(b) occurs when a foreign court or authority provides a dispositive response to each of the items listed in the government's official request for information."); but see United States v. Meador, 138 F.3d 986, 992 (5th Cir. 1998) (concluding more narrowly that "final action" occurs "when the foreign government believes that it has completed its engagement and communicates that belief to our government"). Under these cases, a refusal to supply any evidence would be the foreign government's final action. We note that these cases apparently adopt a meaning of final action that differs from Atiyeh's definition of "final action." On the other hand, however, Atiyeh merely may have set forth nonexclusively one basis for concluding that there has been a "final action."

In this case the Government in its brief stated that November 5, 2002 – the date on which the government of the Bahamas provided some of the requested evidence – was the date of "final action," even though the response was incomplete, and the Government filed its application to suspend the statute after that date. Appellee's Br. at 46, 53. Thus, the Government's understanding of the meaning of final action might differ from that in Atiyeh. If under Atiyeh the "final action" occurs only when the Government receives all of the requested evidence, then the

28

Government's statement that it filed its application after the "final action" was incorrect because it had not received all of the requested evidence when it filed its application. In these circumstances, we would find that the Government's application was not improper because it was filed before it had received all of the evidence, as required by section 3292(a)(1), and the period of suspension would run from the date of the Government's official request for evidence until the date that the Government received all of the requested evidence. Inasmuch as it never has received all of the requested evidence, the period of suspension would have ended three years after the Government made its request for evidence pursuant to section 3292(c).

If, on the other hand, <u>Atiyeh</u> sets forth an exclusive basis for a finding that there has been final action on its request and that interpretation is incorrect, and the "final action" does not occur when the Government has received all requested evidence, but, instead, occurs when the foreign government makes a dispositive response to the Government's request, then the Government's statement that it filed its application after the "final action" was correct because it filed the application after the foreign government made its dispositive response. In these circumstances, we still would find that the Government's application was not improper because the Government filed it before it had received all of the evidence, as required by section 3292(a)(1), even though the period of suspension would run from the date of the Government's official request for evidence until the date that the foreign government took its "final action" by responding to the Government's request on November 5, 2002.

Inasmuch as under either definition the Government's application was not improper because regardless of when, if ever, the foreign government took final action on its request, the Government filed its suspension application when evidence sought was within the foreign country, we conclude that it is not necessary to decide when there has been a final action within section 3292(b). Moreover, we point out that the parties in this case have not litigated the issue of the proper definition of final action under section 3292(b). Accordingly, we will refrain from discussing the

29

Next we will consider whether Hoffecker has waived his contention that the Government's section 3292 suspension application was improper because the Government filed it after the statute of limitations already had expired for Counts Two and Three. Although Hoffecker may have raised this issue before the District Court in his motion to dismiss the indictment, he did not raise the issue in his opening brief before this Court. Instead, after briefing by both parties had been concluded, he filed a letter in which he appeared to raise the issue. See Appellant's Letter (filed Nov. 9, 2007). Hoffecker attempted to file this letter pursuant to Federal Rule of Appellate Procedure 28(j), which provides in pertinent part that:

> [i]f pertinent and significant authorities come to a party's attention after the party's brief has been filed – or after oral argument but before decision a party may promptly advise the circuit clerk by letter, with a copy to all other parties, setting forth the citations. The letter must state the reasons for the supplemental citations, referring either to the page of the brief or to a point argued orally.

In his letter, Hoffecker wrote that he wanted to bring to our attention the decision in United States v. Kozeny, 493 F. Supp. 2d 693 (S.D.N.Y. 2007), in which the district court dismissed several counts of an indictment because the Government filed its section 3292 suspension application after the statute of limitations already had expired on those counts. In citing Kozeny it appears that Hoffecker suggested – although he does not explicitly state as much in his letter – that in this case Counts Two and Three were time-barred because the Government filed the section 3292 suspension application after the statute of limitations period had expired on these counts.

In yet another filing submitted to this Court after the briefs were filed, Hoffecker claims that he did raise this issue in his opening brief on appeal. Appellant's Mot. to Strike Government's Unauthorized and Inaccurate Post-Argument Letter Submission to

---

matter further.

Appellate Panel at 3-4 (filed March 18, 2008). Hoffecker points to a footnote in his opening brief that states: "The statute of limitations expired for Counts 2 (mailing dated June 23, 1997) and 3 (mailing sent August 31, 1997)." Appellant's Br. at 31 n.9. This statement is the only one in the opening brief that Hoffecker contends raised this issue.

This one-sentence footnote falls far short of meeting the requirement that an appellant raise an issue in his opening brief or else waive the issue on appeal. See Pelullo, 399 F.3d at 222 ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."). An appellant's brief must contain his or her argument, which must incorporate "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies . . . ." Fed. R. App. P. 28(a)(9)(A). See United States v. DeMichael, 461 F.3d 414, 417 (3d Cir. 2006) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court." (citation omitted)); United States v. Irizarry, 341 F.3d 273, 305 (3d Cir. 2003) ("An appellant who fails to comply with this requirement fails to preserve the arguments that could otherwise have been raised."); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim. Especially not when the brief presents a passel of other arguments, as [defendant]'s did. Judges are not like pigs, hunting for truffles buried in briefs." (internal citation omitted)). In his footnote, Hoffecker does not explain his contention or the reason for it, and does not include citations to authority or the parts of the record on which he relies. Hoffecker makes no reference to section 3292 or the issue of whether the Government's suspension application was improper because it was filed after the statute of limitations already had expired on Counts Two and Three. Indeed, the footnote is appended to text in which Hoffecker argues that the conspiracy charged in Count One was time-barred because the final overt act of the conspiracy occurred more than five years before the indictment was found, an argument independent from the issue that Hoffecker now seeks to raise.

For the same reasons, we cannot construe Hoffecker's

31

opening brief's statement that "[t]he procedure used by the government to suspend the statute of limitations pursuant to 18 U.S.C. § 3292 to permit it to obtain evidence in a foreign country did not satisfy the statute[,]" Appellant's Br. at 27, as raising the issue of whether the Government's application was improper on the basis that the Government filed it after the statute of limitations already had expired for Counts Two and Three. Although this sentence mentions section 3292, it does not construct any argument about the limitation period already having expired.

Inasmuch as Hoffecker did not raise in his opening brief the issue of whether the section 3292 suspension application was improper because the Government filed it after the statute of limitations had expired on Counts Two and Three, he has waived the issue. Moreover, he cannot seek to raise the argument in a Rule 28(j) letter when he has not raised it in his opening brief. Inasmuch as Hoffecker waived the issue, we need not consider whether the Government's section 3292 suspension application was improper on the ground that the Government filed it after the statute of limitations had expired on Counts Two and Three.[4]

_____

[4]Though we do not decide the case on this basis, Judge Greenberg and Judge Roth point out that under section 3292 there is no express requirement that the application to suspend the statute of limitations must be made before the statute has run. In this regard they point out that under section 3292(b) the period of suspension begins to run when the official request for evidence is made to a foreign country and not when the suspension application is made. Accordingly, the order suspending the statute of limitations necessarily must be retroactive as it cannot be entered until after the request has been made to the foreign country and the order when entered is effective as of the day the request was made. Thus, as a matter of statutory construction there is no reason why a case seemingly barred by the statute of limitations cannot be revived by a section 3292 application made before the Government has received all of the requested foreign evidence. In Judge Greenberg's and Judge Roth's view, the plain language of section 3292 makes the indictment timely as to all counts here. In making this observation Judge Greenberg and Judge Roth further point out that what they regard as this clear application of the statute does

32

The Government contends that Hoffecker also has waived the issues of whether Count One's conspiracy charge was untimely on Hoffecker's theory that the indictment was found more than five years after the final overt act of the conspiracy and the ex parte nature of the Government's § 3292 tolling application was improper.

According to the Government, although Hoffecker raised these issues before the District Court in his motion filed before the first trial and also raised them in his opening brief on appeal, Hoffecker needed to renew his motion in the District Court after the mistrial before the second trial to preserve these claims for appeal. The Government relies for this argument on United States v. Akers, 702 F.2d 1145 (D.C. Cir. 1983), where the Court of Appeals for the District of Columbia Circuit stated that a trial court's admission of evidence in a trial that ends in a mistrial does not justify a defendant's reliance that the judge would admit the evidence in the retrial. In Akers the court stated:

> No doctrine of the law of the case operates under these circumstances. The evidentiary ruling at issue was rendered in a new trial which was ordered pursuant to a mistrial. When, as here, 'the previous trial [is] a nullity,' the court in the new trial tries 'the case as if it were being tried for the first time . . . , as if there had been no prior trial.'

Id. at 1148 (footnotes omitted) (emphasis and alterations in original) (quoting Hobbs v. Maryland, 191 A.2d 238, 239 (Md. 1963)). The court concluded:

---

not mean that section 3292 effectively eliminates the statute of limitations for cases it governs for the period of the suspension begins to run when the request for the evidence is made. Thus, the statute of limitations cannot be revived by an official request to a foreign government made after the limitations period has run. In any event, there is a three-year statutory limitation in section 3292(c) on the suspension period so there is a limit in all cases of the possible length of an extension.

The mere fact that the same judge happened to be sitting did not entitle counsel to assume that the judge would rule the same way especially since the judge's exercise of his broad discretion on an evidentiary ruling (which ultimately pertains to relevancy) must turn upon the evidence as developed in the particular trial.

Id. (footnote omitted); see also United States v. Gomez, 67 F.3d 1515, 1526 n.13 (10th Cir. 1995) (defendant's objection to admission of evidence made during first trial does not preserve issue for appeal after retrial).

In this case, however, we are dealing with the District Court's ruling on Hoffecker's motion to dismiss the indictment on limitations grounds, not an evidentiary ruling. The District Court made this ruling before the first trial started, and the ruling did not "turn upon the evidence as developed in the particular trial." Akers, 702 F.2d at 1148.

Other courts have distinguished Akers on this basis. The Court of Appeals for the District of Columbia Circuit itself later rejected the argument that Akers stands for the proposition that after a mistrial a defendant must re-raise every issue to preserve those issues for appeal. See United States v. Sanders, 485 F.3d 654, 657 (D.C. Cir. 2007). In Sanders, prior to the trial the district court declined to dismiss the case for violations of the Speedy Trial Act. Id. at 656. After the jury was unable to reach a verdict, the district court declared a mistrial. Id. at 655-56. The defendants did not advance the Speedy Trial Act contention before the second trial, and the jury found them guilty. Id. at 656-57. On appeal, the Government contended that the defendants waived their rights under the Speedy Trial Act by failing to renew the Speedy Trial Act objection at the second trial. Id. at 657. The court found that the defendants had not waived the issue:

Akers does not support a requirement to relitigate all pretrial issues before a second trial. Although the partial mistrial and partial grant of a new trial nullified the original trial, those rulings did not nullify all proceedings. For example, the indictment

34

underlying the speedy trial issue was not compromised by the first jury's failure to reach a unanimous verdict on all counts. . . . In any event, the law-of-the-case doctrine underlying Akers does not support the government's position. In Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 816, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988), the Supreme Court summarized the doctrine as providing that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages [in] the same case.' For mid-trial evidentiary rulings, a new trial will result in different factual and evidentiary circumstances occasioning a new exercise of the district court's discretion. However, an alleged violation of the Speedy Trial Act will not change between trials and is constrained by the principle that 'the same issue presented a second time in the same case in the same court should lead to the same result.' LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc). Thus, requiring a defendant to re-raise the issue upon a retrial would be an exercise in wasteful formality.

Id.

We agree with the reasoning in Sanders and find that it applies to this case. As with the alleged violation of the Speedy Trial Act in Sanders, the statute of limitations issues that Hoffecker raised in his motion before the District Court in this case did not change between the two trials. Thus, requiring Hoffecker to re-raise those issues before the retrial would have been "an exercise in wasteful formality." Id.

The Government also contends that United States v. Palmer, 122 F.3d 215 (5th Cir. 1997), supports its argument. In Palmer, the district court originally denied a defendant's motion for severance before the first of his two trials. Id. at 220. After that trial ended in a mistrial, the defendant did not raise the severance issue again until after her retrial began, which was too late under Federal Rule of Criminal Procedure 12(b)(5). Id. On appeal, the Government

35

argued that the defendant had waived her severance claim because "the mistrial invalidated all motions made by [the defendant] at her first trial, requiring her to reassert them at the second in a timely manner." Id. The Government also argued that the defendant was "on notice that her earlier-filed motions would not be carried to the second trial" because of a colloquy before the retrial between her counsel and the trial court. Id. The defendant argued that she had not waived her claim because under the law-of-the-case doctrine, "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Id. (quoting Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391 (1983)).

The Court of Appeals for the Fifth Circuit agreed with the Government, reasoning:

> The law-of-the-case doctrine does not . . . set a trial court's prior rulings in stone, especially if revisiting those rulings will prevent error. For example, we have held that in civil cases a district court is not precluded by the law-of-the-case doctrine from reconsidering previous rulings on interlocutory orders such as summary judgment motions, as those rulings are not immutable and lack res judicata effect. Moreover, we have noted that district courts hearing criminal cases may revisit pretrial issues, such as suppression motions, upon which they have previously ruled. Even considering the law-of-the-case doctrine, we agree with the government and find waiver under these circumstances. A retrial following a mistrial is both in purpose and effect a new trial. Accordingly, objections made at the aborted trial have no bearing on the retrial, as the two are entirely separate affairs. Although formal, written motions such as severance motions may have more of a lasting effect than simple objections, our previous analysis of the law-of-the-case doctrine indicates that district courts are not always bound by their prior rulings on pretrial motions. Here, the trial court expressed in unambiguous terms that it would not automatically

revive any of [the defendant's] pretrial motions. Given that the trial court had the authority to reconsider these motions, the court's statement placed [the defendant] under the duty to reurge them.

Id. at 220-21 (citations omitted). The court concluded by stating:

the trial judge told [the defendant] it was not safe to assume that the court would recognize all of its previous rulings. Thus, [the defendant] was on notice that the trial court was not going to apply the law-of-the-case doctrine to preserve her previous objections. Accordingly, [the defendant] had an obligation to reassert her severance motion in a timely fashion if she wished to preserve error. Failing to do so, [the defendant] waived her severance claim.

Id. at 221. The reasoning of the court in Palmer does not apply to this case, however, because the Government does not point to any colloquy before the retrial between Hoffecker and the District Court that put Hoffecker "on notice" that he must renew all motions that he had made before the first trial. Thus, to the best of our knowledge, unlike the court in Palmer, the District Court here never "expressed in unambiguous terms that it would not automatically revive any of [the defendant's] pretrial motions." Id.

Thus, we conclude Hoffecker did not waive his claim that we should dismiss the conspiracy charged in Count One on his theory that it was untimely and his further contention that the District Court should have instructed the jury on the limitations defense or his claim that we should dismiss the mail frauds charged in Counts Two and Three on the theory that the Government's suspension application was improper because the proceeding before the grand jury judge was ex parte. Accordingly, we will consider these claims on their merits.

First, we will consider the issue of whether we should dismiss the conspiracy charge in Count One because it was untimely and the District Court did not instruct the jury on the limitations defense. Hoffecker claims that if the jury had been so

instructed, it would have found that the last overt act charged in the conspiracy – a March 4, 1998 mailing by Amitex – was not "in furtherance" of the conspiracy, and thus the conspiracy offense was not committed within the five-year statute of limitations.

As we stated above, an indictment for conspiracy to commit mail and wire fraud must be found within five years of the last overt act of the conspiracy. Jake, 281 F.3d at 129 n.6. Here, the Government alleged that the last overt act was a mailing by Amitex on March 4, 1998, to one of its victims, and the indictment was found on February 14, 2003, 18 days before the statute of limitations would have expired if its running was measured from March 4, 1998, without taking into account the 238-day suspension of the running of the statute of limitations. The mailing, which also formed the basis for the mail fraud charged in Count Four, was a letter and a check for $4,039 to Harriet Davis, who had invested $42,903 in the scheme, purporting to send her the balance left in her account. The Government alleged that this mailing was the final overt act of the conspiracy charged in Count One because the mailing was a "lulling communication," i.e., it was intended to lull Davis into believing she merely was an unlucky investor so that she would not complain to regulatory authorities or report a crime.

Before the first trial, Hoffecker filed a motion to dismiss the indictment. During oral argument, he argued that the District Court, not the jury, should determine whether the March 4, 1998 mailing was a lulling communication. Although "[t]he determination of when the crime has been committed for statute of limitation purposes . . . is ordinarily a question of fact for the jury," Oliva, 46 F.3d at 324-25, Hoffecker explicitly asked the District Court to decide the issue because, according to him, "under no interpretation of the facts could this be a lulling letter," app. vol. 2 at 13. The District Court found that the mailing was a lulling communication in furtherance of the conspiracy and that therefore the conspiracy count was timely.

At the charge conference during the second trial, Hoffecker reversed his position and contended that the nature of the letter was a factual matter for the jury to decide. The District Court found that it had ruled definitively on the issue prior to the first trial and stood by its initial ruling. Accordingly, it denied Hoffecker's

request for a jury instruction on the limitations defense for Count One.

We review a district court's decisions regarding jury instructions for abuse of discretion. Leahy, 445 F.3d at 642. We will order a new trial on account of a district court's refusal to give a proposed jury instruction "only when the requested instruction was correct, not substantially covered by the instructions given, and was so consequential that the refusal to give the instruction was prejudicial to the defendant." Id. at 651 (quoting United States v. Phillips, 959 F.2d 1187, 1191 (3d Cir. 1992)). Although it is "well settled that a criminal defendant is entitled to an instruction on the applicable statute of limitations," Jake, 281 F.3d at 129, we conclude that the District Court's refusal to give the proposed jury instruction was not reversible error because it was not "so consequential that the refusal to give the instruction was prejudicial to the defense," Leahy, 445 F.3d at 651.

The court did not prejudice Hoffecker by its refusal to give the instruction because it properly instructed the jury on the elements of the mail fraud charged in Count Four, which was based on the same mailing alleged to be the last overt act of the conspiracy charged in Count One. The court instructed the jury that it could return a verdict of guilty on Count Four only if it found beyond a reasonable doubt that the March 4, 1998 mailing was "intended to further or assist in carrying out or continuing the scheme to defraud." App. vol. 49 at 10; see United States v. Copple, 24 F.3d 535, 544 (3d Cir. 1994) ("The essential elements of the crime of mail fraud are 1) a scheme or artifice to defraud; 2) participation by the defendant with specific intent to defraud; and 3) use of the mail in furtherance of the scheme.").

Thus, in convicting Hoffecker of the mail fraud charged in Count Four, the jury necessarily found beyond a reasonable doubt that the mailing was "in furtherance" of the conspiracy charged in Count One. Inasmuch as the jury found the mailing was in furtherance of the conspiracy and the indictment was found within five years of that mailing, the jury necessarily effectively found beyond a reasonable doubt that Count Four and thus, by extension, Count One were both timely. In these circumstances, the District Court's refusal to give the limitations instruction with regard to

Count One did not prejudice Hoffecker.

Next, we consider the issue of whether we should dismiss Counts Two and Three on the basis of Hoffecker's contention that the Government's section 3292 suspension application was improper because the proceeding before the grand jury judge who granted the suspension order was ex parte. The Government urges us to apply Federal Rule of Criminal Procedure 52(b)'s "plain error" standard of review to this issue because "[e]ven if Hoffecker's failure to raise his limitations defense before his second trial did not waive the claim, it forfeited it." Appellee's Br. at 51; see United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770, 1777 (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right. . . . Mere forfeiture, as opposed to waiver, does not extinguish an 'error' under Rule 52(b).") (citations and quotation marks omitted).

As we found above, Hoffecker has preserved this issue for this appeal. Accordingly, in considering the issue we will apply a de novo standard of review to the District Court's denial of the motion to dismiss on statute of limitations grounds and we will review the court's factual findings underlying the legal ruling for clear error. See United States v. Grenier, 513 F.3d 632, 636 (6th Cir. 2008); United States v. Hagege, 437 F.3d 943, 953-54 (9th Cir. 2006); Laurino v. Tate, 220 F.3d 1213, 1216 (10th Cir. 2000).

We find that there was nothing improper about the ex parte nature of the proceeding before the grand jury judge. As the Court of Appeals for the Ninth Circuit explained, "[n]owhere in [section 3292] does it state that the party whose statute of limitation is being suspended is entitled to notice or a hearing." DeGeorge v. United States Dist. Court for Cent. Dist. of Cal., 219 F.3d 930, 937 (9th Cir. 2000). Significantly, to interpret section 3292 to require notice or a hearing for a defendant "would be to ignore the traditionally non-adversarial and secret nature of grand jury investigations." Id.; see also United States v. Wilson, 249 F.3d 366, 371 (5th Cir. 2001) ("An application to toll the statute of limitations under § 3292 is a preindictment, ex parte proceeding."). We also point out that it might be critical that the existence of an ongoing grand jury

investigation be confidential so that a potential target of an indictment will not be aware of it. A requirement that a section 3292 application be made on notice would undermine the confidentiality of a grand jury's inquiry and give a potential defendant the opportunity to flee or destroy evidence. Accordingly, we will not reverse the convictions on Counts Two and Three on this basis.

### 3. Alleged Prosecutorial Misconduct

Hoffecker claims that cumulative prosecutorial misconduct deprived him of a fair trial. "A new trial is required on this basis only when 'the [ ] errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" Copple, 24 F.3d at 547 n.17 (alteration in original) (quoting United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993)). Hoffecker points to three separate acts of alleged misconduct.

Hoffecker first claims that the Government "hand-picked the transcripts it believed were most helpful to its case, and provided only those transcripts to the jury, notwithstanding that numerous transcripts supporting the defense position had been introduced into evidence." Appellant's Br. at 38. Hoffecker contends that after the jury had deliberated for two days, defense counsel discovered that numerous admitted transcripts and tape recordings had not been included among the exhibits taken to the jury.

This assertion is incorrect. On the first day of jury deliberations, defense counsel asked the court to provide full tape recordings and transcripts that had been admitted into evidence for the jury, not merely excerpts. The District Court granted the request and asked the Government to remove the excerpts from the jury room, which the Government did in the presence of defense counsel. At that point, the Government attorney began to remove three tapes, in the presence of defense counsel, explaining that the tapes contained recordings of conversations involving people who were not witnesses in the case. Defense counsel objected and the Government did not remove the tapes.

On the second day of deliberations, defense counsel filed a

brief contending that an additional 47 tapes and transcripts never had been sent to the jury room. The items involved conversations to which neither the Government nor the defense had referred during trial. Many were inconsequential such as Field's telephone calls to Hoffecker in which Field simply left a message that he had called. According to the Government, these tapes and transcripts had not been sent to the jury room due to a misunderstanding of the parties' stipulation to enter certain tapes and transcripts into evidence.

As the District Court made clear, the Government never "unilaterally removed" any tapes or transcripts from the jury room. App. vol. 53 at 93-94. The court stated that it had "a problem" with defense counsel accusing "the government of some kind of selective removal that was secretive, sly and otherwise inappropriate," given the "care and open process that's been utilized in identifying" the items to be sent to the jury room. Id. at 10. The court explained that "[t]he attorneys at all times were free to work with my staff, work with each other and . . . satisfy themselves that what was in evidence was going to [the jury room.]" Id. at 9. The court pointed out that defense counsel was not aware of the content of the tapes that it complained the jury did not have. Instead, it appeared to the court that defense counsel was attempting to "dump," id. at 26, "relatively meaningless" material on the jury, id. at 98.

During counsel's argument on the issue, late in the afternoon of the second day of deliberations, the jury sent the court a note requesting to hear Tape 38 in its entirety. Because this tape already was in the jury room, the court and the courtroom deputy interpreted the note to mean that the jury was not aware that the tapes and transcripts were already in the jury room.

On the morning of the third day of deliberations, the District Court ruled in favor of the defense and instructed defense counsel and the Government to bring the 47 additional tapes and transcripts to the jury room. The court explained:

> The jury clearly has not begun even approaching the
> transcripts and the tapes . . . . So we have right now
> an opportunity to simply put all of the tapes and

transcripts [in the jury room] while the jury is sitting [in the courtroom] for 90 minutes and listening to [Tape 38] and reading the transcripts that they requested.

App. vol. 54 at 9. After depositing the tapes and transcripts in the jury room, Hoffecker's attorney reported to the court:

The government and defense counsel resolved the matter of all the tapes and transcripts being presented to the jury . . . . [I]ssues raised by the Defendants' Trial Briefs . . . have been fully resolved with the delivery of the tapes and transcripts discussed therein, which would be the complete tapes and transcripts to the jury for use and deliberation.

Id. at 12, 15.

Accordingly, we see no basis for Hoffecker's claim that there was prosecutorial misconduct. Moreover, given the full context and resolution of this issue by the District Court, which ensured that the jury had access to all the tapes and transcripts, there could not have been an error, particularly an error that would have affected the outcome of the proceedings. Hoffecker complains that the jury was "hours away from the verdict," Appellant's Br. at 39, but the jury was not required to revisit these unimportant tapes. Indeed, it does not appear that the jury revisited any of the tapes and transcripts sent to the jury room other than Tape 38. Significantly, Hoffecker never has explained what evidence the tapes and transcripts that were provided to the jury on the third day of deliberations contained, much less explain why this evidence "support[ed] the defense position . . . ." Id. at 38. In these circumstances, we conclude that there was no error.

Hoffecker next contends that Field gave impermissible opinion evidence. On direct examination, Field testified that in his and Hoffecker's meeting on June 12, 1996, Hoffecker admitted to Field that Amitex was promoting an investment in "physical" metal but did not actually purchase metal. App. vol. 28 at 102. Field testified that as a result he concluded Amitex was a "scam." Id. at 102. Hoffecker objected to this testimony but the District Court

ruled that it was admissible lay opinion testimony.

We review a district court's decision to admit lay opinion testimony for abuse of discretion. United States v. Leo, 941 F.2d 181, 192-93 (3d Cir. 1991). Under the Federal Rules of Evidence:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [which governs expert testimony].

Fed. R. Evid. 701.

Two of our cases shed light on whether the District Court abused its discretion when it permitted Field's lay opinion testimony. First, in United States v. De Peri we ruled that the trial court did not abuse its discretion when it permitted the Government's witness to provide his lay opinion regarding his understanding of the meaning of tape recorded conversations between himself and one of the defendants. 778 F.2d 963, 977-78 (3d Cir. 1985). We found that the witness's opinions were helpful to the jury because the "language on the tapes is sharp and abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that are clear only to [the defendant] and his audience. To the uninitiated listener, [the defendant] speaks as if he were using code." Id. at 977. We further noted that "the trial court vigorously policed the government's examination of [the witness] to ensure that he was not asked to interpret relatively clear statements." Id. at 978.

Second, in United States v. Dicker we found that the district court abused its discretion by permitting a Government agent to testify regarding his understanding of his recorded conversations with the defendant. 853 F.2d 1103, 1110 (3d Cir. 1988). In Dicker we stated that "interpretation of clear conversations is not helpful to the jury, and thus is not admissible under either [Rule 701 or

44

702].” Id. at 1108. We found that the Government witness "simply ascribed his own, illicit meaning to straightforward, potentially legitimate statements. This admission was surely prejudicial, and was not helpful to a clear understanding of the testimony. The recorded conversations, unlike those at issue in De Peri, were perfectly clear without [the witness's] 'interpretations.'" Id. at 1110.

Here the District Court found that the Government properly laid a foundation under Rule 701 for Field's statement that Amitex was a "scam." First, Field based the statement on his "rational perceptions," Hoffecker's statements, and his previous interactions with Hoffecker. Supp. app. at 52. The court found that Field's opinion was not based on specialized knowledge because he had "first-hand knowledge and observation." App. vol. 30 at 21. Second, the statement was helpful to the jury because Field's perception that the Amitex program was a "scam" explained why he was a Government cooperator. The court rejected defense counsel's suggestion that Field and Hoffecker's recorded conversations were "clear" and were "matters that this jury can understand." Id. at 19. The court found instead that it was "fair to view the jury as uninitiated listeners," id., and that Field's testimony was helpful to the jurors because Field interpreted his conversations with Hoffecker, and the jury otherwise could not have understood those conversations without Field's testimony. The court found that because the "deliberately" "guarded responses" in the conversations which were "not clear to the uninitiated observer" were akin to "coded words," Field's explanation of the language used in the conversations was helpful to the jury. Id. at 25. The court also noted that in Dicker the Government agent improperly was mischaracterizing the conversation while in this case Field was not mischaracterizing his conversations with Hoffecker. Field also stated his belief that Amitex was a "scam" only one time, as opposed to the agent in Dicker who testified repeatedly in an objectional manner.

The District Court also found that the situation here was unlike that in United States v. Scop, 846 F.2d 135 (2d Cir.), on rehearing, 856 F.2d 5 (2d Cir. 1988), a case Hoffecker cited to support his argument. In Scop, the court of appeals found that Federal Rule of Evidence 704 was violated by the admission of

testimony of a Government expert witness who was an SEC investigator and expert in securities trading practices to the extent that his legal conclusion was that the defendants were "active" and "material participants" in a "fraudulent scheme in furtherance of [the] manipulation [of stock]." Id. at 138. The expert "drew directly upon the language of the statute" and acknowledged that his positive assessment of the testimony of other Government witnesses was a basis for his opinion. Id. at 140-42.

This case, however, differs from Scop because the District Court found that Field was not an expert witness, did not couch his view that Amitex was a "scam" on the language of the mail fraud statute, and did not base his opinion on the credibility or testimony of others. The court found that calling Amitex a "scam" was different from offering a legal opinion and, in any event, under Rule 704(a) a lay opinion is not "objectionable because it embraces an ultimate issue to be decided by the trier of facts." Supp. app. at 53 (quoting Fed. R. Evid. 704(a)). Moreover, the court found that Field was "a witness to the scam at the time of the scam, not someone performing 20-20 hindsight analysis." App. vol. 30 at 22. Field's testimony involved what he thought about Amitex in 1996, not at the time of trial. Field "did not . . . attempt to be a thirteenth juror," because his testimony was not based upon what he had heard at the trial. Id. at 22. In these circumstances, the District Court did not abuse its discretion under Rule 701 in admitting Field's lay opinion testimony.

Furthermore, even if the court erred in allowing this testimony, its error would not have "so infected the jury's deliberations" that it, combined with other alleged errors, "had a substantial influence on the outcome of the trial." Copple, 24 F.3d at 547 n.17. Field's one-time reference to Amitex as a "scam" on direct examination was brief, and the Government did not refer to Field's testimony on this point again during the trial. In addition, his brief comment that he believed Amitex was a "scam" was hardly likely to shock the jury given Hoffecker's own tape-recorded admission that "[i]n America, Amitex cannot operate. It would be a scam." Supp. app. at 40. Indeed, it is surreal that Hoffecker complains about a witness using Hoffecker's own term to describe his scheme.

46

Finally, Hoffecker argues that the Government improperly bolstered Field's credibility by asking him on redirect how many convictions resulted from his cooperation. Hoffecker's cross-examination of Field elicited the following:

| | |
|---|---|
| Defense Counsel: | . . . [Y]ou were an informant in a number of cases, were you not? |
| Field: | I think there were several, yes sir. |
| Defense Counsel: | Well, let's quantify that. How many other cases were you involved in where you were . . . acting in a capacity as an informant for the government? |
| Field: | Two directly. |
| Defense Counsel: | Okay. And can you tell the jury how many people, either indicted or unindicted, that you spoke to in your capacity as an undercover informant? |
| Field: | Probably two dozen maybe. |

App. vol. 32 at 85. Defense counsel also attacked Field's motive to testify by questioning the benefits that resulted from Field's cooperation and suggesting that his conviction and 24-month sentence were far less severe than what he should have faced given the potential charges and his 35-year maximum statutory sentencing exposure.

On redirect, the Government sought to clarify the misleading inference that Field received a substantial reduction at sentencing based only on his work in this case, when Field, in fact, cooperated on many unrelated investigations:

| | |
|---|---|
| Government: | Both defense lawyers asked |

47

| | |
|---|---|
| | you questions about your cooperation with law enforcement; do you recall those questions, sir? |
| Field: | Yes, sir. |
| Government: | As part of your cooperation with law enforcement, did you provide information on a number of people separate and apart from Mr. Hoffecker and Mr. Myers and [the] Amitex program? |
| . . . . | |
| Field: | Yes, sir. |
| Government: | To your knowledge, Mr. Field, how many individuals were convicted or investigated as a result of your cooperation? |
| Field: | There were over [a] dozen convicted. I don't know how many more were investigated, sir. |

App. vol. 34 at 67.

Hoffecker then objected and moved for a mistrial, citing United States v. Sorondo, 845 F.2d 945 (11th Cir. 1988), as support for his claim that the prosecutor improperly bolstered Field's credibility. In Sorondo the defendant, who was arrested after supplying drugs to a Drug Enforcement Administration ("DEA") informant, claimed that the informant entrapped him. Id. at 947. The Government called as a rebuttal witness a DEA agent who testified regarding the number of cases in which the informant had participated and the amount of money and property that had been forfeited to the Government due to his assistance. Id. at 948. The

48

Government also elicited testimony that all of the 40 prosecutions in which the informant had participated had resulted in convictions. Id. On appeal, the court of appeals found that the admission of this testimony was plain error because it "created a great danger that the jury would simply credit [the informant's] testimony and find in favor of the government because many other juries had done so in the past." Id. at 949.

In this case, the District Court considered Sorondo and found that it arose in a different context. There, a Government agent was called on rebuttal to bolster the credibility of a Government witness. Here, by contrast, the testimony of the cooperator on re-direct "went to the usefulness of the cooperation, the substantial assistance . . . as a basis for . . . sentencing decisions. . . ." App. vol. 37 at 20. Defense counsel's cross-examination of Field risked leaving the jury with the misimpression that Field received an extraordinary reduction in his sentence as a result of his help only in one case, and Field's re-direct simply corrected that misimpression. The District Court found that the "context dilutes the harmfulness of the testimony." Id.

Nevertheless, the Government requested the District Court to instruct the jury to disregard any testimony by Field involving convictions of other individuals which were not related to this case. The court noted that because the matter was brought to its attention in a timely fashion – unlike in Sorondo, where no timely objection was made – it could fashion a curative instruction. The court invited counsel to draft an instruction and carefully "tracked the concerns of the defense that the jury instruction not appear to highlight the testimony that was objected to." Id. at 24. The court then instructed the jury in pertinent part:

> During its redirect examination of Mr. Field the government asked Mr. Field how many people were convicted as a result of his cooperation. At the time, this was objected to. I am now sustaining the defense objection. Whether or not Mr. Field's cooperation led to any prosecutions or convictions is irrelevant to your consideration of the charges in this case. I instruct you that you must disregard this testimony. And it must not be considered by you in

49

any way in your deliberations.

Id. at 30.

We doubt that this curative instruction was needed because Hoffecker opened up this whole line of inquiry himself but, assuming that it was required, the instruction certainly was sufficient to cure any error in the Government's eliciting the disputed testimony from Field. In light of this instruction, combined with the ample evidence demonstrating Hoffecker's guilt, we find that the testimony did not have "a substantial influence on the outcome of the trial." Copple, 24 F.3d at 547 n.17. Accordingly, the three alleged errors Hoffecker raises do not alone or in combination require reversal of his convictions.

> 4.      Jury Instructions

Hoffecker next argues that he was denied a fair trial because the District Court rejected several of his requested jury instructions and overruled his objections to two other instructions. "We exercise plenary review to determine whether jury instructions misstated the applicable law, but in the absence of a misstatement we review for abuse of discretion." Cooper Distributing Co. v. Amana Refrigeration, Inc., 180 F.3d 542, 549 (3d Cir. 1999).

First, the District Court rejected Hoffecker's requested instruction on "single or multiple conspiracies" which stated in pertinent part that "[p]roof of separate or independent conspiracies is not sufficient" for the Government to sustain its burden of proof for the conspiracy charge in Count One. App. vol. 59 at 148. The District Court rejected this instruction because it concluded it was inapplicable to the evidence presented in the case and would mislead and confuse the jurors. Hoffecker contends this decision was incorrect because the Government's proof of "multiple business operations, the divisions between Global and Amitex, the investments in other companies, and the distinctions between the operations of the various sales rooms, among others, all combine to provide factual support for a finding of multiple conspiracies." Appellant's Rep. Br. at 38.

We recognize that "[i]f a defendant asks for a charge on

50

multiple conspiracies and there is sufficient evidence to support such an instruction, the failure to grant the request can be reversible error," United States v. Curran, 20 F.3d 560, 572 (3d Cir. 1994), but that principle is inapplicable here because the evidence did not support the instruction. Despite the complexity of the scheme in this case, the evidence could not support a conclusion that there had been a conspiracy other than the one charged. All of the business entities and divisions in labor existed to advance the single conspiracy to dupe victims into investing in Amitex's LPCIP. In these circumstances, inasmuch as there was not an evidentiary basis for Hoffecker's requested instruction if it had been given it only would have confused the jury. Moreover, the District Court gave a clear instruction that the jury only could convict Hoffecker if it found that he knowingly and willingly joined the single charged conspiracy. We conclude that the District Court did not abuse its discretion when it rejected Hoffecker's requested jury instruction on "single or multiple conspiracies."

The District Court also rejected Hoffecker's requested instruction on "conjecture and speculation," which stated:

> Of course, a defendant is never to be convicted on suspicion or conjecture. If, for example, you view the evidence in the case as reasonably permitting either of two conclusions – one that a defendant is guilty as charged, the other that the defendant is not guilty – you will find the defendant not guilty. It is not sufficient for the Government to establish a probability, though a strong one, that a fact charged is more likely to be true than not true. That is not enough to meet the burden of proof beyond reasonable doubt. On the other hand, there are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.

App. vol. 59 at 150. The court rejected the instruction because it duplicated the reasonable doubt instruction that it already had given to the jury explaining:

> The reasonable doubt instruction that I read to the

51

jury is an instruction that has been discussed and approved of in Third Circuit cases . . . and I believe that it is a fair depiction and expression of the law of reasonable doubt. And the language [in Hoffecker's requested instruction] does not advance the ball . . . . [and] might becloud what I have told the jurors.

App. vol. 48 at 102. The District Court was correct: we had approved the District Court's reasonable doubt instruction. See United States v. Hernandez, 176 F.3d 719, 728-35 (3d Cir. 1999) (mirroring our model instruction, Third Circuit Model Criminal Jury Instructions § 3.06). Thus, there was no need for the court to give Hoffecker's requested instruction. Accordingly, the court in rejecting the "conjecture and speculation" instruction did not abuse its discretion.

The District Court also rejected Hoffecker's requested "theory of defense" instructions. The first of these stated:

It is the defense in this case that the Defendants through its [sic] company Amitex employed the services of Peter Hug and Associates, Phoenix, and Perrigrine to hedge its customers' positions in the forward and futures markets. It is further the defense that Amitex maintained as much as $2 million in its bank accounts to cover the liquidation value of its customers' investment. I instruct you that if you find that the Defendants in fact did protect their customers['] investments through hedging, you may consider this as evidence of the Defendants['] lack of criminal intent.

App. vol. 59 at 155. The second instruction stated:

It is the defense in this case that the Defendants are not responsible for any misrepresentations made by brokers working at sales offices marketing Amitex'[s] program. I hereby instruct you that if you find that material misrepresentations were made by brokers, you cannot consider there [sic] misrepresentations as evidence of the Defendants[']

52

criminal intent, unless you find that the misrepresentations were made with the knowledge and consent of the individual Defendant.

Id. at 156.  The third instruction stated:

It is the defense in this case that the Defendants were not required to take physical possession of any commodity offered through the Amitex program until such time as the customer paid for the commodity in full.  I hereby instruct you that if you find that the Amitex documents provided to the customers were consistent with this belief, you may consider this as evidence of the Defendants['] lack of criminal intent.

Id. at 157.  The fourth instruction stated:

It is the defense in this case that the Amitex Program provided for physical delivery of a commodity upon the payment for the commodity in full or upon the repaying of the 80% loan value extended by Amitex. It is further the defense that the loan Amitex made to its customers was a genuine obligation Amitex entered into binding Amitex to hedge either in cash or in the future or forward markets the value of the commodity equal to the customers 80%.  I hereby instruct you that if you find that Amitex had the ability to deliver commodities to its customers and hedged its obligations so as to guarantee delivery, you may consider this evidence of the Defendants['] lack of criminal intent.

Id. at 158.  The fifth instruction stated:

It is the defense in this case that the Defendants disclosed all commissions, fees, and charges to its customers and that the Defendants through Amitex informed its customers that speculating in commodities had a high degree of risk and that the customer could lose their [sic] entire investment.  I

hereby instruct you that if you find that these expenses were disclosed and that the customers were informed of the risks of speculating in commodities, you may consider this in determining the reasonableness of any customers['] testimony that they were misled. You may further consider this in determining the materiality of any statements by the Defendants alleged to have been false or misleading.

Id. at 159. The sixth instruction stated:

It is the defense in this case that the Defendants reasonably believed that their program was not an off exchange future subject to regulation by the CFTC. As such, the defendants contend that they did not intentionally mislead their customers by claiming that Amitex was not a futures product. I hereby instruct you that in determining the reasonableness of this claim you may consider the differences between the program marketed by Amitex and that offered on the futures exchanges. To that end you may consider evidence presented at trial that the size of the contract offered on a futures exchange was larger than that offered by Amitex making delivery easier; that futures contracts are of a limited duration, usually a matter of months, requiring the customer to sell out of their position or take delivery by a date certain; and that in a futures contract, a customer could be forced out of the market owing additional money to the exchange. I further instruct you that if you find that these differences are present you may consider this evidence in determining whether the Defendants acted with criminal intent.

Id. at 160. The seventh instruction stated:

An honest mistake of fact is a complete defense to all charges in the indictment, because it is inconsistent with the existence of wrongful intent, which is an essential element of the charges. Such

54

an honest mistake negates the criminal intent of a defendant when the defendant's acts would be lawful if the facts were as the defendant supposed them to be. A defendant whose actions are based on an honest belief that the defendant was acting lawfully is not chargeable with intentional criminal conduct – even if this belief was erroneous or mistaken. The burden of proof is not on the defendant to prove the defendant's honest belief of a mistaken fact, since no defendant has any burden to prove anything.

Id. at 161. The eighth instruction stated:

It is the position of the defendants that they never entered or intended to enter into any conspiracy to commit mail and wire fraud and that they never engaged in, or agreed to engage in, fraudulent activities. Further, the defendants maintain they were honest businessmen whose interest was in providing legitimate speculative investment opportunities to customers.

Id. at 162.

"A defendant is entitled to a theory of defense instruction if (1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an instruction of the defendant's theory would deny him a fair trial." United States v. Wren, 363 F.3d 654, 664 (7th Cir. 2004), vacated on other grounds, Yarbor v. United States, 543 U.S. 1101, 125 S.Ct. 1021 (2005). As the Court of Appeals for the Fifth Circuit has pointed out, however, a defendant is not "entitled to a judicial narrative of his version of the facts, even though such a narrative is, in one sense of the phrase, a 'theory of the defense.'" United States v. Barham, 595 F.2d 231, 244 (5th Cir. 1979). In Barham the court found that the district court properly rejected the defendant's proposed "theory of the defense" instruction because it was

essentially a recounting of the facts as seen through the rose-colored glasses of the defense – glasses that

[the defendant] hoped the jurors would wear when they retired to the jury room. . . . As the Trial Judge commented, the requested instruction was more in the nature of a jury argument than a charge.

Id. at 244-45 (footnote omitted); see also United States v. Paradies, 98 F.3d 1266, 1287 (11th Cir. 1996) ("We find that the district court was correct in finding that the requested jury charge was partisan and that it aspired 'to place the . . . defendants' desired factual findings into the mouth of the court.'").

The District Court correctly refused to give Hoffecker's requested "theory of defense" instructions because they were argument. When considering these proposed instructions, the court stated:

I think that they stray . . . into a commentary on the evidence and make[] the Court, as it were, stand alongside arguments to come regarding how the jurors view the evidence. And to insert myself in that way, I think, would in somewise change my role as the neutral giver of the law and turn me into some what of . . . a commentator on argument and I'm not only reluctant but it's not my role to do that . . . .

App. vol. 48 at 105. The court was correct. Moreover, many of Hoffecker's "theory of the defense" instructions, such as the "mistake of fact" instruction and the "lack of intent to enter a conspiracy" instruction, duplicated other instructions that the District Court gave on the subject of criminal intent, such as the charges on "knowingly and willfully" and the "good faith defense" to fraud. In these circumstances, Hoffecker was not entitled to have the court charge the jury on his requested "theory of defense" instructions and the court did not abuse its discretion when it rejected the instructions.

Hoffecker also contends that the District Court erred by giving two other instructions to the jury. First, the court gave an instruction that the negligence of a victim was not a defense to the charged crimes. The language of this instruction paraphrased our statement of the law: in United States v. Rennert, we stated that a

"fraud victim's negligence or lack of diligence in uncovering the fraud is not a defense." 374 F.3d 206, 213 (3d Cir. 2004) (citing United States v. Coyle, 63 F.3d 1239, 1244 (3d Cir. 1995)), vacated on other grounds, Miller v. United States, 544 U.S. 958, 125 S.Ct. 1744 (2005). Accordingly, the court did not abuse its discretion when it chose to give this instruction to the jury.

The court also gave the following "absence of an attorney-client relationship" instruction, to which Hoffecker objects:

> You have heard testimony that Jack Field was a practicing attorney. In addition, you heard that Jack Field represented Charles "Chip" Hoffecker in the FTC v. Uni-Vest, Hoffecker, et al. matter that concluded in July 1991. As [a] matter of law, I am instructing you that during the period charged in the Indictment, Jack Field was not Mr. Hoffecker's lawyer. Furthermore, Jack Field was not Mr. Myers's lawyer, Global Investment's lawyer or Amitex's lawyer at any time. As a result, for purposes of your deliberation, I am instructing you that Mr. Field did not have an attorney-client relationship with Mr. Hoffecker, Mr. Myers, Global or Amitex.

App. vol. 49 at 22-23.

Hoffecker argues this instruction prejudiced him because Field was an attorney who "provided advice and counsel" to him, and Field was a principal component of the Amitex operation. Appellant's Br. at 45. Accordingly, he contends that "the jury should have been allowed to consider the impact of Field's role as a lawyer on his actions and intent." Id. Hoffecker therefore contends that this instruction "was reversible error based on the evidence." Appellant's Rep. Br. at 44.

The Government responds that the instruction "was proper given the facts of this case and defense counsel's attempts to mislead the jury." Appellee's Br. at 87. The Government notes that "there was no evidence to support the theory that Field served as Hoffecker's counsel during the fraud, no legal advice was given

57

by Field, and none was relied upon by Hoffecker." Id. The Government further contends that throughout the trial "defense counsel attempted to mislead and confuse the jury by suggesting that Hoffecker lacked the criminal intent to commit fraud because he relied on Field's legal advice to purportedly run a legitimate operation." Id. at 88. The Government points out that even after the District Court gave the "absence of an attorney-client relationship" instruction to the jury, defense counsel argued at closing that Hoffecker lacked the criminal intent to commit fraud because he was following Field's legal advice, an argument prompting the court to repeat its instruction.

We conclude that the Government's view of the evidence is correct and that Hoffecker has no evidentiary support for his argument that the instruction was improper on the theory that Field acted as his attorney during the Amitex investigation or gave Hoffecker legal advice, or that he relied on Field's legal advice. Therefore, we will not reverse his convictions on that basis.

Finally, in a letter submitted after oral argument, Hoffecker raises the issue of whether the District Court's "absence of an attorney-client relationship" instruction infringed his Sixth Amendment right to a jury trial by deciding an element of each the charged offenses. Appellant's Letter (dated April 1, 2008). In his letter, Hoffecker contends:

> [i]t is the jury's responsibility to assess Mr. Hoffecker's belief and the reasonableness thereof in evaluating whether he acted with the specific intent to defraud. . . . The defense was unconstitutionally deprived of the right to have the jury decide whether Mr. Hoffecker reasonably relied on the advice of counsel. The district court's determination that no attorney-client relationship existed cannot supplant the constitutional mandate that the jury is to decide fact issues, especially questions of intent.

Id. at 4-5.

After reviewing the record, however, we find that Hoffecker did not raise this issue before the District Court or in his opening

58

brief on appeal. Indeed, there is very little discussion of this instruction in the record. According to Hoffecker's letter:

> The complete discussion and argument on the jury instructions took place during the charge conference, a proceeding the district court conducted off the record in the absence of the court reporter beginning on March 6, 2006. . . . Following that conference, the government submitted to the court and defense counsel its proposed written Charge No. 54 [regarding the absence of an attorney-client relationship] by email on March 7, 2006, the day before the court instructed the jury.

Id. at 1-2. On March 8, 2006, the day after the Government submitted its proposed charge, the District Court gave instructions one through twenty-five to the jury before excusing the jury for the day. The following exchange then occurred:

| | |
|---|---|
| THE COURT: | Counsel, initially I have read jury instructions 1 through 25 to the jury. Is there any objection to the charge as it was read thus far? |
| PROSECUTOR: | No, your Honor. |
| THE COURT: | Defense. |
| DEFENSE COUNSEL: | Your Honor, we agree that the charge as read reflects the charge that the Court advised you would read during the r o b i n g    r o o m conference. Having said that, there were a number of items that we requested or objected to that the Court ruled on, |

|  |  |
|---|---|
|  | and the appropriate time I can make a record of that. |
| THE COURT: | Well my suggestion is that we attend to those issues now less [sic] we lose track of them. I have no problems dealing with motions such as we're going to be addressing later on. But this is right on point so let's get it done. And I think, [defense counsel], you indicated that there were additional charges, so we're not talking just about language changes but whole additional charges you were going to proffer to the Court, and I would like to hear from you on those as well. |
|  | . . . . |
| DEFENSE COUNSEL: | Your Honor, there are no further objections to the instructions as read for instructions 1 through and including 25. The remainder would be items the Court has not yet read or are items dealing with the requested supplemental jury instruction. |

| THE COURT: | Let's jump into that number. |
|---|---|

App. vol. 48 at 95-96, 98. The court and counsel then discussed various proposed instructions.

Eventually, counsel for Hoffecker addressed the instruction with which we are concerned, stating, "And we object to Charge Number 54: Absen[ce] of [an] Attorney-Client Relationship. The Court did make a change to the proposed language based on the defense position. But in other respects [it] is including the instruction and we object to it its institution [sic]." Id. at 117.

At no point in the record does Hoffecker explain the basis for this objection, and the District Court's ruling on the objection is not in the record, although we believe that the court overruled the objection because the court gave the instruction (renumbered as Charge Number 44a) the next day to the jury. App. vol. 49 at 22-23.

After the court finished instructing the jury, it held the following sidebar:

| THE COURT: | Counsel, was the reading of the jury instruction satisfactory? |
|---|---|
| PROSECUTOR: | Yes, ma'am. |
| DEFENSE COUNSEL: | It was, Judge. And we reserve the objections previously made, but we have no additional objection. . . . . I do have a note, Judge, to make. Since prior to the start today, we had a brief additional charge conference that was not reported. We did raise a number of issues and |

61

|  |  |
|---|---|
|  | in some respects objections and alterations, as given to the Court. I think the procedure is, you will allow us to put it on the record at the appropriate time, but the position we took during the pre- part two of the charge to the charge will otherwise be preserved? |
| THE COURT: | We'll take our time to go through the charge and you will have a chance to put on the record the alterations. You asked for them and I didn't include them and we'll do that. |
| DEFENSE COUNSEL: | Thank you. |

Id. at 32-33. The Government and the defendants then made their closing arguments to the jury.

At one point during Hoffecker's closing argument, the Government objected because "there were several attempts by [defense counsel] to do an end run around your earlier ruling and your instruction that Jack Field was not an attorney for purposes of Amitex and Global." App. vol. 50 at 117. The District Court then instructed the jury: "I am reminding you that Mr. Field is not Mr. Myers['s] lawyer, Global Investment's lawyer or Amitex's lawyer at any time, and for purposes of your deliberations, I instruct you that Mr. Field did not have an attorney-client relationship with Mr. Hoffecker or Mr. Myers or Global or Amitex . . . ." Id. at 121. Later, during Myers's closing argument, the Government again objected for the same reason and the court told the jury:

Ladies and gentlemen, I remind you again of the

instruction concerning Jack Field. You heard that he was a practicing attorney, but you also heard me tell you, and I remind you again, that as a matter of law, I instruct you that during the period charged in the indictment Jack Field was not Mr. Hoffecker's lawyer, Mr. Myers's lawyer, Global Investment's lawyer or Amitex's lawyer at any time. And for purposes of your deliberation, I instruct you that Jack Field did not have an attorney-client relationship with Mr. Hoffecker, Mr. Myers, Global or Amitex.

App. vol. 51 at 29.

After closing arguments, but before the jury left to begin deliberating, Hoffecker's counsel stated: "I want to, we renew all prior comments and objections in connection with the jury instruction. . . . . I do want the record to reflect that the Court is allowing us to preserve all the previous objections that we have made and requests that we have made." App. vol. 52 at 55. That is the last statement in the record that we have located relating to Hoffecker's objections to the jury instructions.

As we noted, Hoffecker never stated the basis for his objection to the "absence of an attorney-client relationship" instruction on the record. Moreover, in his opening brief on this appeal, Hoffecker's entire discussion regarding the instruction was the following:

The defendant was prejudiced by Charge 44a – Absence of Attorney-Client Relationship (A59:172). At all times, Field was a lawyer, Field provided advice and counsel to Hoffecker, and Field was a principal component of the Amitex operation. The jury should have been allowed to consider the impact of Field's role as a lawyer on the defendant's actions and intent.

Appellant's Br. at 45. As we noted above, in his Reply Brief, Hoffecker makes clear that his argument is that "based on the evidence" the instruction was incorrect. Appellant's Rep. Br. at 44.

63

Because Hoffecker did not raise before the District Court or in his opening brief on appeal the issue of whether the District Court's "absence of an attorney-client relationship" instruction infringed his Sixth Amendment right to a jury trial by deciding an element of each of the charged offenses, he has waived it. See Fed. R. Crim. P. 51(b) ("A party may preserve a claim of error by informing the court – when the court ruling or order is made or sought – of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection."); Pelullo, 399 F.3d at 222 ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.").

But even if we were to consider this issue, we would find that Hoffecker has not shown plain error or, indeed, error at all in its disposition. See Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); United States v. Wise, 515 F.3d 207, 214 (3d Cir. 2008) (reviewing jury instructions for plain error after defendant failed to raise an argument before the district court). "Under the plain error standard, 'before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Williams, 464 F.3d 443, 445 (3d Cir. 2006) (alterations in original) (quoting United States v. Vazquez, 271 F.3d 93, 99 (3d Cir. 2001)). To affect substantial rights, an error must be "prejudicial, i.e., it 'must have affected the outcome of the district court proceedings.'" United States v. Nappi, 243 F.3d 758, 762 (3d Cir. 2001) (quoting Olano, 507 U.S. at 734, 113 S.Ct. at 1778).

Here, the District Court clearly left to the jury the determination of whether the Government established beyond a reasonable doubt each of the elements of conspiracy and mail fraud. For example, the court instructed the jury that to convict Hoffecker of conspiracy it must find beyond a reasonable doubt that he willfully participated in the unlawful plan charged with intent to commit mail fraud and wire fraud:

So, if a defendant[], with understanding of [the] unlawful character of a plan knowingly encouraged, advise[d] or assist[ed] for the purpose of furthering the undertaking or scheme, [he] thereby bec[a]me [a] willful participant[], that is, [a] conspirator[]. . . . [W]hether or not the defendants were members of the conspiracy may be determined upon all of the evidence in this case, including the reasonable inferences that you draw from that evidence.

App. vol. 48 at 87-88.

The court also instructed the jury that to convict Hoffecker of mail fraud it must find beyond a reasonable doubt that he

participated in the scheme knowingly, willfully and with intent to defraud. Intent to defraud means to act knowingly and with a specific intent to deceive, for the purpose of causing some deprivation or loss to another of money or property. The question of whether a person acted knowingly, willfully and with intent to defraud is a question of fact for you to determine, like any other fact question. This question involves a person's state of mind.

App. vol. 49 at 8-9 (emphasis added). The court then elaborated on the definition of "knowingly" and "willfully":

A person acts knowingly if that person acts consciously and voluntarily with an awareness and realization of what was happening and not because of mistake or accident or other innocent reason. The purpose of adding the word 'knowingly' is to ensure no one will be convicted for an act done because of mistake or accident or other reason. A person acts 'willfully' if that person knowingly acts voluntarily, deliberately and intentionally as contrasted with acting accidently, carelessly or unintentionally. So, if you find beyond a reasonable doubt that the acts constituting the crime charged were committed by a defendant voluntarily as an intentional violation of a

65

known legal duty, that is, with the specific intent to do something that the law forbids, then the element of willfulness [a]s defined in these instructions has been satisfied. In determining whether a defendant has acted knowingly and willfully, it is not necessary for the government to establish that the defendant knew that he was breaking a particular law.

Id. at 13-14. The court also instructed the jury:

Good faith is a complete defense to the charges in the Indictment, since good faith on the part of a defendant is inconsistent with intent to defraud or with willfulness, which are essential parts of the charges. The burden of proof is not on the defendants to prove good faith, of course, since the defendants have no burden to prove anything. The government must establish beyond a reasonable doubt that the defendants acted with the specific intent to defraud as charged in the Indictment. One who expresses an honestly held opinion or an honestly formed belief, is not chargeable with fraudulent intent even though the opinion is erroneous or belief is mistaken; and similarly, evidence which establishes only that a person made a mistake in judgment or error in management or was careless, does not establish fraudulent intent.

Id. at 16.

In light of the District Court's instructions and the fact that the Government produced overwhelming evidence to establish Hoffecker's intent to commit the charged crimes, we find that the District Court's "absence of an attorney-client relationship" charge did not affect the outcome of the proceeding. Accordingly, we find no plain error, or, as we have indicated, any error at all, in this aspect of the District Court's instruction.

5.      Alleged Perjury by a Government Witness

Hoffecker next argues that his right to due process was

66

violated when a former Global employee, Gregory Swarn, allegedly perjured himself during his trial testimony. In particular, Hoffecker claims that Swarn testified falsely with respect to his education on direct examination when he stated that he had received a college degree. Hoffecker points out that on cross-examination, when his attorney questioned Swarn about a transcript that showed that he was five hours short of completing the degree, Swarn explained that he had graduated from college and had completed his requirements because course work from another institution should have been credited to him.

Hoffecker also claims that Swarn testified falsely as to his employment with Global. On cross-examination, defense counsel produced broker/trader licensing applications in which Swarn did not list Global as a prior place of employment. On re-direct, Swarn explained that he had not admitted to having worked at Global and several other companies because those companies had been scams, not legitimate businesses. Also during cross-examination, defense counsel noted that Swarn had not told the Federal Bureau of Investigation ("FBI") or the United States Probation Office in Florida that he had worked at Global. Swarn explained that he had not wanted to volunteer the information because he had not paid taxes on income from Global and that the FBI did not ask him specifically about Global. Finally, in response to defense counsel's questions about why there was no documentation showing that Swarn had been on the Global payroll, Swarn testified that he had been paid in cash.

Approximately three weeks after Swarn's testimony had concluded, Hoffecker filed a motion to dismiss the indictment or, in the alternative, to strike Swarn's testimony and a motion for the appointment of a special prosecutor to investigate Swarn's alleged perjury. The District Court denied the motion.

A witness commits perjury if he or she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116 (1993). To establish a due process violation, Hoffecker must show that: (1) Swarn committed perjury; (2) the Government knew or should have known of Swarn's

perjury; (3) Swarn's testimony went uncorrected; and (4) there is a reasonable likelihood that the false testimony could have affected the verdict. See Lambert v. Blackwell, 387 F.3d 210, 242 (3d Cir. 2004). We review for clear error a trial court's factual finding that a witness's testimony was not false and we will not disturb that finding unless it is wholly unsupported by the evidence. United States v. Johnson, 327 U.S. 106, 111-12, 66 S.Ct. 464, 466 (1946); Gov't of V.I. v. Lima, 774 F.2d 1245, 1251 (3d Cir. 1985).

The District Court found that Hoffecker failed to show that Swarn had given false testimony or that the Government knowingly had offered perjured testimony. The court found that Swarn's testimony that he had received a college degree was not intentionally false because Swarn had offered an explanation for his belief that he had graduated. The court also found that Hoffecker could not show that Swarn was testifying falsely when he stated that he had worked for Global, despite the lack of documentation. The court found that Swarn's admission that he did not tell the Florida Probation Office about his employment at Global did not demonstrate that he committed perjury and appropriately could be addressed by defense counsel in his closing argument when discussing Swarn's credibility. Finally, the court found that evidence that Swarn might have lied in filling out regulatory or tax forms did not demonstrate that he had committed perjury when he testified in this case.

We find that the District Court did not err when it found that Hoffecker had not shown that Swarn committed perjury. Swarn gave reasonable explanations for his alleged false testimony, leading us to conclude that he testified truthfully. Although defense counsel showed that Swarn previously had concealed his employment with Global, this circumstance does not mean that he lied about his employment on the witness stand and counsel was free to comment on Swarn's credibility during closing argument. It must be remembered that we are concerned here with whether Swarn's testimony was false in this case, not whether he had been forthright in other situations. Moreover, Hoffecker did not show that the Government knew or should have known of Swarn's alleged perjury. In fact, we are surprised that Hoffecker has raised these rather inconsequential matters as a basis for a reversal here inasmuch as when Swarn's allegedly false testimony is considered

68

within the context of the entire case we see no chance at all that, even if false, it could have affected the verdict. In these circumstances, the Government's use of Swarn's testimony did not violate Hoffecker's due process rights.

### 6. Exclusion of Expert Testimony

Hoffecker next contends that the District Court improperly excluded three defense expert witnesses in violation of his constitutional right to present relevant evidence. On December 13, 2005, three business days before jury selection in the second trial, and 34 months after the indictment had been returned on February 14, 2003, Hoffecker notified the Government of his intent to call three experts: Ian MacDonald, Rodney Stavert, and Sterling Quant. App. vol. 59 at 72-90. According to the notices, MacDonald "may provide testimony with respect the metals markets" and "about his analysis of the program offered by Amitex . . . ." Id. at 73-74. Quant "may provide general testimony with respect to the legal framework that governs domestic and international businesses [sic] entities in the Bahamas" and "about the framework of Amitex's business transactions under Bahamian law." App. vol. 59 at 80. Stavert "may provide testimony with respect to the metals market" and "may analyze the program offered by Amitex . . . ." App. vol. 59 at 86. The District Court found that Hoffecker had failed to comply with Federal Rule of Criminal Procedure 16(b)(1)(C) because the notice was late and deficient. As a sanction for this noncompliance, the court precluded the three experts from testifying at trial.

The Sixth Amendment guarantees a defendant the right "to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend. VI. But the right to present relevant evidence is "subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 1264 (1998). The Supreme Court explained in Scheffer that:

> A defendant's interest in presenting such evidence may thus bow to accommodate other legitimate interests in the criminal trial process. As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding

evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve. Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

Id. (citations and internal quotation marks omitted). In harmony with the Supreme Court's later decision in Scheffer, we earlier had indicated that "[t]his court has upheld the exclusion of expert witnesses as an appropriate sanction for a party's violation of a discovery order or some other pre-trial order." United States v. 68.94 Acres of Land, 918 F.2d 389, 396 (3d Cir. 1990).

Federal Rule of Criminal Procedure 16(b)(1)(C) which concerns reciprocal discovery of expert witnesses provides in pertinent part:

> The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if – (i) the defendant requests disclosure under subdivision (a)(1)(G) [providing for government disclosure of its expert witnesses] and the government complies . . . . This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(b)(1)(C). The rule is meant

> to prevent the defendant from obtaining an unfair advantage. For example, in cases where both prosecution and defense have employed experts to make psychiatric examinations, it seems as important for the government to study the opinions of the experts to be called by the defendant in order to prepare for trial as it does for the defendant to study

those of the government's witnesses.

Id., Advisory Committee Notes (1966 Amendment). Moreover, the rule is "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Id., Advisory Committee Notes (1993 Amendment). Significantly, "[a]lthough no specific timing requirements are included, it is expected that the parties will make their requests and disclosures in a timely fashion." Id. If a party fails to comply with Rule 16(b)(1)(C), the court may:

> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

Courts of appeals have upheld the exclusion of experts when defendants fail to serve timely notice of their intent to call them as witnesses. In United States v. Petrie, for example, the defendant, who had been indicted for conspiracy to launder money after he participated in a scheme to dupe persons interested in obtaining venture capital funding, waited until the Friday afternoon prior to the commencement of trial on the following Monday to disclose his expert to the Government. 302 F.3d 1280, 1283, 1288 (11th Cir. 2002). The district court precluded the defendant's expert from testifying at trial as a sanction for the untimely disclosure. Id. at 1288-89. On appeal following his conviction, the defendant claimed that his proposed expert witness's testimony "would have been highly relevant and extremely probative," and that the witness "would have explained the whole syndication world, and would have talked about what a letter of credit is and why letters of credit need to be confirmed from a top 50 or a top 100 bank." Id. at 1288 (quotation marks omitted). The Court of Appeals for the Eleventh Circuit affirmed the conviction, noting that almost a year and a half had passed between the return of the superseding indictment and

71

the defendant's trial and that the expert's testimony "would have simply provided the jury with background information regarding financial matters." Id. at 1288-89.

The District Court here found that Hoffecker had violated Rule 16(b)(1)(C) by filing a late and deficient notice. The court first explained the context of its decision:

> [T]he proceeding at hand is a retrial. The attorneys for Mr. Hoffecker and Mr. Myers are the same attorneys that . . . represented them at the first full jury trial, and for all of the pretrial proceedings in both trials. Second, there have been numerous requests for adjournments, all made by the defense over the vigorous objection of the government. . . . [E]ighteen months have gone by since the retrial. At no time was the issue of experts raised in the context of the need for additional time. . . . [P]rotective notice to rely on expert testimony, . . . was filed by both [defense attorneys]. . . . [T]hat notice evidences the defendants' awareness of their Rule 16 obligations.

App. vol. 14 at 133-35. The court further noted that the record in the case "shows a continuing series of requests by the United States for material that these defendants were unequivocally required to provide under Rule 16(b)(1)(C)." Id. at 135. The District Court then stated that an expert witness may testify only if his testimony is relevant and helpful to the jury, and asked, "How can a Court make that determination? How can an adversary effectively cross-examine absent that information? All of this takes predicate time and exploration and investigation, and all of that would preclude a late notice such as this." Id. at 138. The court further found that Hoffecker's notices were facially deficient, stating that "[c]onspicuously omitted from their notices . . . are the opinions and basis and reasons for the opinions of [the] three proposed experts. Merely the subjects of what they may discuss is offered." Id. at 139. Finally, the court found that there were "no factual circumstances that [have] been presented by the defendants to excuse the problems [with the notices]," and ordered that "[t]he only and proper response of the Court is to exclude the proposed

72

testimony . . . ." Id. at 144.

Hoffecker makes several arguments to support his claim that the District Court abused its discretion by excluding the three expert witnesses. He cites United States v. Davis for the proposition that "the compulsory process clause of the sixth amendment forbids the exclusion of otherwise admissible evidence solely as a sanction to enforce discovery rules or orders against criminal defendants." 639 F.2d 239, 243 (5th Cir. 1981). But the Supreme Court effectively rejected the Davis holding in Taylor v. Illinois, as it concluded that a preclusion sanction can be an appropriate response to a criminal defendant's discovery violation. 484 U.S. 400, 416, 108 S.Ct. 646, 656 (1988). The Court stated that

> a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

Id. at 414-15, 108 S.Ct. at 656. In light of the Supreme Court's decision in Taylor, we will not follow the earlier opinion in Davis.

Hoffecker also contends that United States v. Peters held that exclusion of a defense expert for failure to provide timely notice is impermissible in the absence of any discovery violation. 937 F.2d 1422, 1426 (9th Cir. 1991). In Peters, the district court excluded the defendant's expert witness for violation of a local disclosure rule. Id. at 1424. The court of appeals reversed, finding that the defendant had not violated any clear discovery rule and thus exclusion of the testimony was inappropriate. Id. at 1426. Here, unlike the defendant in Peters, Hoffecker violated the notice requirement contained in Federal Rule of Criminal Procedure

73

16(b)(1)(C). See also United States v. Ramone, 218 F.3d 1229, 1237 n.5 (10th Cir. 2000) (distinguishing Peters because Ramone violated Federal Rule of Evidence 412's notice requirement). Accordingly, the holding in Peters is inapplicable in this case.

Hoffecker also argues that the Government had notice of the three experts for more than two months prior to the commencement of the defense case. While this may be true, it is misleading because it ignores the fact that the Government only received notice of the experts three business days before jury selection. Moreover, when Hoffecker gave his notice neither the court nor the Government could have known how long the interval would be between the giving of the notice and the start of the defense case. Overall it is clear that the notice simply did not give the Government enough time to prepare for these three experts, especially considering the complexity of the case and the circumstance that the Government had its attention and resources focused on jury selection and its case-in-chief when Hoffecker notified the Government of these proposed witnesses. Clearly, admission of this testimony would have been an affront to the public interests in the "integrity of the adversary process," "the fair and efficient administration of justice," and "the truth-determining function of the trial process . . . ." Taylor, 484 at 414-15, 108 S.Ct. at 656.

Hoffecker also argues that the three witnesses were "vital" and "would have altered the outcome of the trial" but fails to support this argument. Appellant's Br. at 48. In his brief, Hoffecker states that "MacDonald would have testified regarding the commodities market, including the legitimacy of the Amitex program," Stavert "would have focused on the pricing of investments through a market maker," and Quant "was proffered to testify about the legality of Amitex as a Bahamian corporation." Id. Hoffecker's generalized explanations do not provide us with any real information about what these experts would have said at trial or why their testimony "would have altered the outcome of the trial." Hoffecker has not offered their opinions or the basis for those opinions, in violation of his obligation under Rule 16(b)(1)(C). Why, for example, was Amitex's program "legitimate"? For all we know from what we can discern from Hoffecker's deficient notice, like the defendant's expert in Petrie,

74

these experts "would have simply provided the jury with background information regarding financial matters." 302 F.3d at 1289. Hoffecker clearly has failed to show us that the District Court abused its discretion when it found that his notice of his intention to call the witnesses was deficient and untimely.

Finally, in a letter submitted to this Court on March 25, 2008, Hoffecker cites United States v. Nacchio, 519 F.3d 1140 (10th Cir. 2008), where the Court of Appeals for the Tenth Circuit reversed a defendant's conviction because the district court had abused its discretion when it excluded the defendant's expert under the mistaken belief that the defendant's Rule 16(b)(1)(C) disclosure was required to contain extensive discussion of the expert's methodology. Id. at 1151. The court found that the error was not harmless because "if credited by the jury, [the expert's testimony] might have changed the jury's mind" and "[t]he record does not otherwise contain overwhelming evidence of guilt . . . ." Id. at 1156 (citation and quotation marks omitted).

Nacchio is distinguishable from this case for several reasons. Here, the District Court excluded Hoffecker's experts both for the insufficiency of the notice of their testimony and for the inexcusable delay in providing notice while in Nacchio the timing of the defendant's notice was not at issue. Moreover, Hoffecker's notice was insufficient because it did not include the experts' opinions and the bases and reasons for those opinions which Nacchio stated Rule 16 requires. Id. at 1150. Finally, we cannot conclude that the District Court's exclusion of his experts prejudiced Hoffecker. He never has explained adequately how the expert testimony would have been relevant and material, and unlike in Nacchio, here there is "overwhelming evidence of guilt."

In these circumstances, Hoffecker has not met his burden by showing that the District Court's action was arbitrary, fanciful, or clearly unreasonable. See Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002). He has not attempted to explain why his notice was late and deficient and we see no reason why he could not have obtained these witnesses far sooner. After all, he had 34 months after his indictment to obtain the testimony, as compared to the 18 months the defendant in Petrie had between the indictment and the trial, but nevertheless would have us believe

75

that on the eve of the second trial all three witnesses suddenly became available. Neither his opening nor reply brief addresses the reason for the delay. Moreover, we are struck by the circumstance that not one or two but three witnesses suddenly became available. How can we avoid believing that their availability reflected a change or refinement of Hoffecker's trial strategy? Inasmuch as we are not as gullible as Hoffecker's victims, we simply cannot believe that it was not until that late date that all three of these experts suddenly became available or could have become available. Overall, we find it to be clear that the court did not abuse its discretion when it excluded Hoffecker's expert witnesses as a sanction for violating Rule 16(b)(1)(C).

7.	Admission of Evidence of the Civil Injunction against Hoffecker

Hoffecker also argues that the District Court abused its discretion when it admitted evidence of a civil injunction that had been entered against him. As we discussed above, the Federal Trade Commission brought an action in 1989 against Hoffecker and a business named "Uni-Vest" alleging deceptive and unfair acts and practices. App. vol. 9 at 11. The FTC action was successful for in July 1991 a district court entered a permanent injunction against him in the Southern District of Florida "forever enjoin[ing] and restrain[ing him] from telemarketing precious metals when the purchasing of precious metals is to be made in whole or in part with financing." Id. at 11-12.

Hoffecker moved prior to the first trial to exclude evidence of the entry of permanent injunction but the District Court denied his motion because it found that the evidence was "intrinsic" to the offenses charged in this case. Hoffecker renewed the motion prior to the second trial but the court denied the motion and made the further finding that evidence of the injunction was relevant on the question of whether Amitex's customers would have invested in Amitex's LPCIP, particularly in light of Hoffecker's likely defense that the customers were not victims of a conspiracy but merely were disappointed investors who had been given the information they needed to make their investment decision.

During the second trial, the Government introduced

76

evidence of the injunction several times in its case-in-chief by asking witnesses who were former customers of Amitex whether they knew about the order imposing the lifetime ban on Hoffecker and, if they had been unaware of it, whether they would have wanted to know about the ban before deciding whether or not to send money to Amitex to purchase physical commodities. Even former Global employee, Fran Leone, who, after all, was in frequent contact with Hoffecker, also testified that she was not aware of the lifetime ban on Hoffecker when she worked for him at Global. Clearly, Hoffecker was keeping quiet about the injunction.

Hoffecker argues that the District Court abused its discretion when it admitted evidence of the injunction, which he contends was "irrelevant and prejudicial evidence of uncharged conduct" that placed his character "in a bad light" and "conditioned" the jury to conclude that Hoffecker and Myers were "fraudsters." Appellant's Br. at 50-52. The Government answers that evidence of the injunction was "intrinsic" to the charged offenses and thus was admissible. The Government further argues that, even if this evidence was not intrinsic, it was admissible under Federal Rule of Evidence 404(b) because it was introduced to prove something other than bad character. "We review a district court's decision to admit evidence for abuse of discretion." United States v. Gibbs, 190 F.3d 188, 217 (3d Cir. 1999).

Rule 404(b) governs the admissibility of evidence of "other acts" and states in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). Thus, Rule 404(b) "does not apply to evidence of uncharged offenses committed by a defendant when those acts are intrinsic to the proof of the charged offense." Gibbs, 190 F.3d at 217 (holding that the defendant's participation in

77

uncharged acts of violence was admissible as direct proof of his participation in cocaine conspiracy); see also Fed. R. Evid. 404, Advisory Committee Notes (1991 Amendment). "[A]cts are intrinsic when they directly prove the charged conspiracy." United States v. Cross, 308 F.3d 308, 320 (3d Cir. 2002). Even if the evidence is "extremely prejudicial to the defendant," "the court would have no discretion to exclude it because it is proof of the ultimate issue in the case." Gibbs, 190 F.3d at 218 (quoting 22 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5239, at 450-51 (1978)); see also United States v. Bobb, 471 F.3d 491, 497-98 (3d Cir. 2006) (holding that evidence of an uncharged assault by the defendant was admissible because it was direct evidence of his participation in and enforcement of conspiracy to distribute crack and cocaine).

Evidence of the lifetime ban on Hoffecker was part of the charged offense. The indictment charged that "[i]t was part of the conspiracy that . . . Hoffecker . . . intentionally concealed and failed to disclose to investors in the LPCIP that, as a result of a lawsuit brought by the Federal Trade Commission in 1991, . . . Hoffecker was permanently prohibited from selling, or offering to sell, precious metal on a financed basis. As a result of this prohibition . . . Hoffecker . . . operated Amitex outside the United States and claimed that [he] did not engage in transactions involving commodity futures or options in order to avoid regulation by the U.S. Commodity Futures Trading Commission and other U.S. regulatory authorities." App. vol. 1 at 18-19.

Moreover, the Government was required to prove Hoffecker's intent to commit the charged crimes of conspiracy to commit mail fraud and mail fraud. During the second trial, in anticipation of Hoffecker's defense that he lacked the intent to defraud and that he never intended to misrepresent or omit material facts in developing his commodities program, the Government used evidence of the lifetime ban against him to show that Hoffecker purposefully was engaging in forbidden conduct and that he structured Amitex off-shore to avoid regulatory and law enforcement scrutiny. The ban further explained why Hoffecker set up the fraud in a sophisticated manner, using at least two companies: Amitex that was incorporated off-shore as a financial institution and Global and other boiler rooms that were located

78

within the United States. The ban also explained why Hoffecker created layers of false pretenses to hide his ownership of the two companies. The Government also used the evidence to show that Hoffecker had failed to disclose a material fact to potential Amitex customers and that concealment of this material fact constituted fraud. In the circumstances, the District Court properly admitted the injunction evidence because it was "intrinsic" to the charged offenses.

Hoffecker claims that the District Court's decision to admit the evidence of the injunction allowed the Government to "have it both ways": he argues that it was unfair that he was not permitted to argue that Field was his attorney between 1996 and 1998 even though the court allowed the Government to use evidence of the 1991 injunction entered in an action in which Field acted as his attorney. Appellant's Rep. Br. at 53. But the District Court admitted the evidence that Field was Hoffecker's lawyer during the case that resulted in the 1991 injunction; there is no evidence supporting his argument that Field still was acting as his lawyer during the 1996-98 Amitex conspiracy. Accordingly, the District Court did not err in admitting the evidence of the entry of the injunction.

Hoffecker also argues that the admission of different evidence regarding a different consent decree arising out of yet another company called "Uni-Met" prejudiced him. But the court admitted evidence of this consent decree exclusively against Hoffecker's co-defendant Myers. Only the person whose prior acts are at issue may raise a Rule 404(b) challenge on appeal. See United States v. Davis, 154 F.3d 772, 779 n.3 (8th Cir. 1998) (defendants lack standing to challenge evidence of other defendant's other acts on Rule 404(b) grounds); United States v. David, 940 F.2d 722, 736 (1st Cir. 1991) ("Objections based on Rule 404(b) may be raised only by the person whose 'other crimes, wrongs, or acts' are attempted to be revealed."); see also United States v. Washington, 12 F.3d 1128, 1135 n.2 (D.C. Cir. 1994). Accordingly, Hoffecker cannot raise a Rule 404(b) challenge to the admission of the Uni-Met consent decree against Myers.

Moreover, the District Court twice instructed the jury regarding the Uni-Met evidence, making clear that this evidence

79

was "not admissible as to Mr. Hoffecker and cannot be considered by you in evaluating the case involving Mr. Hoffecker." App. vol. 49 at 21; vol. 15 at 12. These instructions minimized any "spillover" prejudice to Hoffecker arising from the admission of this evidence. See United States v. Johnson-Dix, 54 F.3d 1295, 1308 (7th Cir. 1995) (stating that "[e]ven if Rule 404(b) evidence is properly admitted against one defendant in a joint trial, . . . the district court must consider whether the evidence may have a 'spillover' effect that could deprive the other defendants to whom the evidence does not apply of their right to a fair trial" and that a limiting instruction would "minimize[ ] any spillover prejudice"); David, 940 F.2d at 736 (limiting instruction to the jury is "the proper course to ensure against prejudicial spillover"). In the circumstances, the District Court did not err in admitting this evidence at trial.

### 8. Exclusion of Hoffecker's out-of-court statements

Hoffecker next contends that the District Court erred when it did not permit co-defendant Myers to play the entirety of a tape recording, portions of which the Government had played during its case-in-chief, as admissions by a party-opponent. In the recording made on February 24, 1997, Hoffecker was making a presentation to CIC, a Government undercover operation in East Brunswick, New Jersey, seeking to recruit CIC as an Amitex boiler-room. Hoffecker asserts that he made statements on the tape that support his claim at trial that Amitex was a legitimate operation.

The Government contends that Hoffecker has waived this claim because although Myers raised the issue before the District Court, Hoffecker never sought to play the CIC tape himself and did not join in or adopt Myers's motion. The Government suggests that Hoffecker made a strategic decision not to join in Myers's motion because he feared that by offering his own purportedly exculpatory out-of-court statements, he would trigger the Government's use of his own inculpatory statements he made to the Government during two proffer sessions in May 1999. Hoffecker entered into a proffer agreement with the Government which permitted the Government to use his proffer statements against him "to rebut any evidence or arguments offered on" his behalf. Supp. app. at 102-04. The Government contends that by

80

offering his own exculpatory statements on the CIC tape to argue that Amitex was a legitimate business, Hoffecker would have contradicted the statements he made during his proffer sessions and thus open the door to the Government using his proffer statements to attack his credibility as a hearsay declarant on the CIC tape. Accordingly, the Government contends that Hoffecker had something to lose by raising this claim in the District Court and thus by making the strategic choice not to join in Myer's motion, he has waived the claim.

Hoffecker responds that the Government's argument "ignores the strength of the operative trial agreement that bound both defendants to all objections and evidence unless expressly opting out, a protocol initiated by the district court at the first trial and continued throughout the retrial." Appellant's Rep. Br. at 54. Hoffecker does not, however, provide us with a citation to the record to demonstrate this "operative trial agreement." Hoffecker contends that, under this agreement, Myers's motion to admit the CIC tape "fully preserved this evidentiary issue for appellate review." Id. at 55.

We question whether Hoffecker has preserved this issue for the appeal. But even assuming that he has not waived the claim, we conclude that the claim is without merit because the evidence is inadmissible hearsay. See Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); Fed. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules . . . .").

Hoffecker claims that the CIC tape is not hearsay because he did not offer it for the truth of the matter stated but as evidence of his then existing state of mind. See Fed. R. Evid. 803(3) (Hearsay rule does not apply to "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . ."). He argues that the tape is evidence of his state of mind because it "presents a more complete picture of Hoffecker's attitude toward his customers, and his repeated emphasis that sales must be based on

correct information, that Amitex was a delivery program in which deliveries would always be made upon the investor's direction, and that Amitex hedged all investor positions through hedging expert Hug." Appellant's Br. at 54-55.

Hoffecker is incorrect. Of course, the mere fact that he claimed he offered the tape for a different purpose does not change the reality that he offered it for its truth, i.e., to show that Amitex was a legitimate operation. The District Court characterized the statements as his "description of how to sell in a way that is wholly legal," a characterization with which Myers agreed. App. vol. 34 at 16. The District Court found that the statements were

> plain and simple exculpatory. This statement is a sell about the legitimacy of the Amitex program. This statement is being made to people that Mr. Hoffecker believed would be agents of his program and he had every reason to want them to sign on and sell aggressively for his own personal gain.

Id. at 22. As the Government pointed out during oral argument before the District Court, admitting his out-of-court statements about the legitimacy of the Amitex operation would have been tantamount to allowing Hoffecker to testify without being subject to cross-examination. Indeed, in his Reply Brief Hoffecker states that the CIC tape was "corroborative of the defense claims of actual innocence and markedly inconsistent with government portrayals of an ongoing fraud scheme . . . . [It] contained the very fabric of the Amitex program as explained to brokers . . . ." Appellant's Rep. Br. at 54, 56. It is apparent that he offered these out-of-court statements solely for their truth. In these circumstances, we agree with the District Court and find that the court properly excluded the tapes as inadmissible hearsay.

Hoffecker also takes issue with the District Court's decision to allow the Government to introduce and play portions of the CIC tape for the jury. This decision, however, was not erroneous because the Government could offer the statements as admissions by a party-opponent. See Fed. R. Evid. 801(d)(2).

Hoffecker also contends that Myers should have been

82

allowed to play the entire CIC tape for the jury pursuant to the doctrine of completeness. Federal Rule of Evidence 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." As we have explained, additional portions of a recording may be played "if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." United States v. Soures, 736 F.2d 87, 91 (3d Cir. 1984) (citing United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982)). "The Rule does not require introduction of portions of a statement that are neither explanatory of nor relevant to the passages that have been admitted." Id.

Hoffecker argues that it was necessary to admit his statements on the entirety of the CIC tape to rebut his statements on another recording, the "Westin tape," which the Government played in its entirety, and to rebut his unrecorded statements that two former Global employees testified that they recalled. The Westin tape was a recording of Hoffecker's sales tutorial to his telemarketers at Westin, one of his telemarketing businesses. The two former Global employees testified that they heard Hoffecker give similar presentations to the Global sales force.

The context of the CIC tape, however, was very different from the context of the Westin and Global presentations. At CIC, Hoffecker sought to woo prospective boiler-room sales people to join his Amitex sales force. Hoffecker did not own or control CIC and was visiting CIC for the first time when he made these statements. Hoffecker's sales pitches to his employees at Westin and Global, two companies that he owned and controlled, were "much more frank and blatant, explaining to them how to talk to and treat customers in order to defraud them." Appellee's Br. at 117. As the Government points out, his "instructions to his telemarketers whom he had co-opted into his fraud . . . were probative of [his] intent to defraud[, while] the CIC tape was probative of how Hoffecker would attempt to recruit prospective telemarketers (whom he had never met before, had no control over, and had not yet co-opted into his scheme)." Id. at 117-18.

83

Significantly, Hoffecker does not point to any specific statement on the CIC tape to support his arguments.

In these circumstances, we find that Hoffecker has not shown that the CIC tape was necessary to explain or place in context the Westin tape or the testimony about the Global presentation, avoid misleading the jury, or "insure a fair and impartial understanding." Soures, 736 F.2d at 91. Accordingly, we conclude that the District Court did not err when it did not permit Myers to play the CIC tape in its entirety at trial.

9.      Alleged improper comments by the prosecutor during closing argument

Hoffecker next argues that the prosecutor made improper comments during closing argument by "becoming a trier of fact," misstating trial testimony, and alluding to criminal conduct not analogous to the charged crimes. Appellant's Br. at 56. "We review a district court's decision not to grant a mistrial on the grounds that the prosecutor made improper remarks in closing argument for abuse of discretion." United States v. Dispoz-O-Plastics, Inc., 172 F.3d 275, 282 (3d Cir. 1999) (citation and quotation marks omitted).

First, Hoffecker contends that the prosecutor "repeatedly took on the role as trier of fact." Appellant's Br. at 56. He points to the following remarks the prosecutor made during rebuttal: (1) when discussing testimony concerning Amitex's financing program, the prosecutor said, "I don't know whether folks were asleep or whatever," and then, "I don't know what other kind of proof somebody might expect"; (2) in response to defense counsel's distinction between El Houri having an office and having representations, the prosecutor said, "I guess they were what, personal friends of Mr. Walid El Houri or what?" (3) addressing the businesses attributable to El Houri, the prosecutor stated, "I still haven't heard any explanation for the lie that there were billions of dollars in business with respect to which Mr. Pedro Rolle said that there was absolutely no evidence of"; (4) discussing the Amitex representations in documents, the prosecutor stated, "If that's not fraudulent intent, telling people one thing and then doing something else, I don't know what is"; (5) the prosecutor stated,

"All right, we know that Amitex lied to its customers"; (6) responding to defense counsel's argument regarding Amitex storage, the prosecutor said, "Are we on the same planet? Did we sit through the same two plus months of evidence?" (7) the prosecutor stated, "Last time I checked, 'held' means in English – of course, I don't know about the Twilight Zone – holding on to something"; (8) the prosecutor stated, "We're still looking for that magic word hedging. It's like searching for the Holy Grail. Look at all these documents, look for the word hedging. There's going to be a reward out for that"; and (9) when discussing a Government's witness's analysis of hedging, the prosecutor stated, "So if this doesn't prove beyond any reasonable doubt that the whole song and dance with respect to hedging is a charade, I'm not sure what would." App. vol. 51 at 108-28.

As the District Court found, the above-quoted comments were mere "rhetorical devices" or "throw-away comments" and "there is not the prosecutor standing in front of evidence or no evidence or trying to create evidence by saying, 'you have to find this because I say so,' or 'this is what this says' in the face of no argument or no exposition of what the so-called evidence is." App. vol. 52 at 16-17. The court concluded that these remarks all constituted proper argument, and we cannot find that the court abused its discretion in reaching this conclusion. A prosecutor is permitted – indeed, expected – to comment on the evidence that was presented at trial and connect the dots for the jury by explaining what each piece of evidence means and how it all fits together to prove his or her case. Such comments are particularly helpful after a long trial such as that here, particularly when the indictment charges offenses committed in a complex, sophisticated business context. The prosecutor's comments were not improper injections of personal opinion or facts not in evidence.

Next, Hoffecker argues that the prosecutor misstated the trial testimony of defense expert Ed Strongin. During rebuttal summation, the prosecutor quoted from the transcript of the defense closing in which Myers's attorney twice stated that, according to Strongin, Hoffecker and Myers sent over one million dollars to the Phoenix hedge fund. The prosecutor then compared defense counsel's claim to evidence admitted at trial that showed that less than one million dollars actually went to Phoenix.

85

Defense counsel then requested a side bar conference and explained to the court that while the evidence showed that less than one million dollars went to Phoenix, additional money went to a different hedge fund called Peregrine. Defense counsel stated that he had misspoken during his closing argument and meant to say that over one million dollars went to Phoenix and Peregrine together. The District Court ruled that the prosecutor neither had misquoted defense counsel nor misstated Strongin's testimony regarding how much money actually was sent to Phoenix. We agree with the District Court, and find that this ruling rather than being the product of an abuse of discretion was absolutely appropriate. After all, it would be quite remarkable to hold that the prosecutor made an improper comment when he accurately referred to a defense attorney's argument. In fact, it was the defense attorney who misstated the testimony, not the prosecutor.

Finally, Hoffecker argues that during rebuttal, the prosecutor twice alluded to violent crimes not analogous to the charged offenses. First, in response to Hoffecker's closing argument that Field should have intervened as a lawyer to advise him that Amitex was fraudulent, the prosecutor pointed out that Field was a government informant who was infiltrating the fraud, and analogized his role to that of an undercover informant infiltrating a drug gang: "that's like saying when the government sends in an undercover into a drug gang, the undercover is supposed to come in and approach the gang leader . . . and say, 'no, no, no, no, you're a bad boy, you shouldn't sell drugs.'" App. vol. 51 at 104-05. Second, in response to Hoffecker's closing argument that Amitex was a legitimate operation because it had an office and employees, the prosecutor stated, "[i]f you're running a sophisticated scam or you're hoping to scam people the second and third and fourth and fifth time as these folks did, of course, you have to have an operation. This isn't like running down the street and grabbing somebody's pocketbook. Frauds are ongoing. This fraud was ongoing." Id. at 107.

The District Court found that the prosecutor properly had rebutted Hoffecker's closing argument without implying that he had committed a violent crime. First, the court found that the prosecutor's reference to a drug gang was not a specific reference to violence but, instead, was an attempt to analogize Field's

86

situation to a more common or familiar context for undercover activity. Moreover, the court noted that it "was not Jack Field's job at the time" to make Hoffecker's recorded conversations less incriminating, and that the prosecutor's statement properly rebutted Hoffecker's closing argument to that effect. App. vol. 52 at 10-11. In any event, Hoffecker's argument that Field should have told him that he was engaging in a fraudulent operation is nothing short of bizarre. If one thing is obvious it is that Hoffecker's activities were not technically illegal as being in violation of some intricate regulation but, as the evidence overwhelmingly demonstrated, were a complete scam which is exactly what Hoffecker intended that they be. We cannot find that the court abused its discretion in this instance.

Furthermore, the prosecutor's reference to purse-snatching explicitly contrasted Hoffecker's own crimes with that offense. This statement clearly did not imply that he had committed a violent act. Moreover, the jury surely knew that this case did not involve violence.

Hoffecker cites United States v. Moore, 375 F.3d 259 (3d Cir. 2004), to support his argument. In Moore we reversed the defendant's convictions when, on the eve of the first anniversary of the September 11, 2001 terrorist attacks, the prosecutor referred to the defendant as a "terrorist" because, according to evidence of other bad acts that improperly had been admitted at trial, he was a violent drug dealer who "inflicted terror" upon his girlfriend and her family. Id. at 264. We noted in Moore that we have reversed convictions where "'[t]he object, or at least effect, of this disproportionate emphasis by the prosecution . . . was to portray [the defendant] as . . . violence-prone . . . [and] a danger to society and who needed to be removed for the protection of the public.'" Id. (alterations in original) (quoting United States v. Himelwright, 42 F.3d 777, 786 (3d Cir. 1994)).

In this case, by contrast, the prosecutor did not suggest that Hoffecker engaged in any violent conduct. Instead, he alluded to non-violent criminal conduct to rebut directly Hoffecker's closing argument. The prosecutor did not disproportionately emphasize an uncharged violent crime to portray him as "violence-prone" or "a danger to society who needed to be removed for the protection of

the public."[5]  Id.  We conclude that the District Court correctly found that the prosecutor's rebuttal was appropriate.

### 10.    Hoffecker's Sentence

Finally, Hoffecker challenges his sentence of 210 months of imprisonment.  We review sentences for procedural errors and for substantive reasonableness.  We first must ensure that a district court did not commit a significant procedural error in arriving at its decision, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range."[6]  Gall v. United States, 128 S.Ct. 586, 597 (2007).  We review a district court's decision under an abuse of discretion standard.  Id.  "[A] district court will be held to have abused its discretion if its decision was based on a clearly erroneous factual conclusion or an erroneous legal conclusion." United States v. Wise, 515 F.3d 207, 217 (3d Cir. 2008).

If we determine that a district court did not make any significant procedural errors, we then review the substantive reasonableness of the sentence under an abuse-of-discretion standard.  Gall, 128 S.Ct. at 597.  We may not reverse a district court's sentence simply because we would have imposed a different sentence.  "As long as a sentence falls within the broad range of possible sentences that can be considered reasonable in light of the § 3553(a) factors, we must affirm."  Wise, 515 F.3d at 218.

Hoffecker first contends that the District Court unconstitutionally augmented the sentence because it took into

---

[5]We do not intend to imply that only criminals engaged in violent acts are dangers to society.  Surely Hoffecker was a danger to his victims on whom he intentionally inflicted grievous harm.

[6]In making our Guidelines calculations we use the 1997 Guidelines Manual as it was in effect at the time of the offenses.

consideration facts the jury did not find. Hoffecker's base offense level was 6 pursuant to U.S.S.G. § 2F1.1(a). The District Court applied several enhancements under the Guidelines and added 31 offense levels to his base offense level, resulting in a total offense level of 37 and an advisory Guidelines range of 210 to 262 months (capped at the 240-month statutory maximum). As we explained in United States v. Grier, "[o]nce a jury has found a defendant guilty of each element of an offense beyond a reasonable doubt, he has been constitutionally deprived of his liberty and may be sentenced up to the maximum sentence authorized under the United States Code without additional findings beyond a reasonable doubt." 475 F.3d 556, 561 (3d Cir. 2007) (en banc). We went on in Grier to explain:

> Post-Booker, the punishments chosen by Congress in the United States Code determine the statutory maximum for a crime. The Code identifies the facts necessary to establish an offense and any aggravating circumstances (e.g., significant drug quantity, use of a firearm, injury to a victim) that increase the statutory maximum punishment. These facts must be established beyond a reasonable doubt. But, once these facts are found, triggering the statutory maximum, the judge may impose a sentence anywhere under that maximum without jury determinations and proof beyond a reasonable doubt.
>
> . . .
>
> None of the facts relevant to enhancements or departures under the Guidelines can increase the maximum punishment to which the defendant is exposed. The Due Process Clause thus affords no right to have these facts proved beyond a reasonable doubt.

Id. at 565-66 (citations omitted). Accordingly, the District Court did not violate the Constitution when it enhanced Hoffecker's base offense level by taking into account facts the jury did not find.

Hoffecker next argues that the District Court erred when it

89

applied six different enhancements that increased his offense level by 27. First, he contends that the District Court erred when it applied a 15-level enhancement to his offense level pursuant to U.S.S.G. § 2F1.1(b)(1)(P) because Hoffecker was responsible for losses totaling $14,151,596. According to the Sentencing Commission's commentary,

> For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

U.S.S.G. § 2F1.1 cmt. 8. Hoffecker argues that the District Court's finding was mere speculation. The District Court arrived at the $14,151,596 total by combining Amitex's disbursements of $9,944,655 and Global's realization of $4,206,941 in "commissions" and "fees." Far from being speculative, bank records supported the court's calculation of these amounts and expert testimony at the trial was a further basis for the court's conclusions. Furthermore, if anything, the $14,151,596 total was a conservative estimate as it was based on incomplete Amitex banking records and did not include losses attributed to Amitex's boiler-rooms other than Global. In these circumstances, we conclude that the District Court did not err when it applied the 15-level enhancement to Hoffecker's offense level.

Second, Hoffecker argues that the District Court erred when it applied a 2-level enhancement pursuant to U.S.S.G. § 2F1.1(b)(2) because the offense involved more than minimal planning and defrauded more than one victim. The Guidelines define "[m]ore than minimal planning" as:

> more planning than is typical for commission of the offense in a simple form. 'More than minimal

90

planning' also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which § 3C1.1 (Obstructing or Impeding the Administration of Justice) applies. 'More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.

U.S.S.G. § 1B1.1 cmt. n.1(f). The District Court found that:

The testimony is ample in this case. The scheme was complex. . . . The defendants' efforts to create and operate it were substantial and extensive and documented through the secretly recorded conversations. The victim testimony made it clear that there were provided with statements, brochures and other indices of a legitimate scheme that were, in fact, contrived and carefully so by Mr. Hoffecker and Mr. Myers. The broad geographical scope of the victims and the nationwide boiler-rooms that were set up were demonstrated by the evidence. The location off-shore to avoid oversight was a lynch pin of the intended success and actual success of the operation.

App. vol. 55 at 53-54. In these circumstances, the District Court did not err when it applied the 2-level enhancement to Hoffecker's offense level. Indeed, it is rare for us to see a case involving as much planning as there was here.

Third, Hoffecker claims that the District Court erred when it applied a 2-level increase pursuant to U.S.S.G. § 2F1.1(b)(3)(B) because he violated a prior lifetime injunction in committing his offenses. As we discussed above, the injunction stated that Hoffecker:

should not telemarket, sell, offer for sale, [engage in] brokering a sale, promoting a sale, or promoting the brokering of a sale, arranging for a sale, or arranging

91

the brokering of a sale over the telephone involving precious metals when the purchase of precious metal is to be made in whole or in part with financing.

App. vol. 55 at 21. The District Court found that the injunction "applies on all fours on the type of investment activity that the jury found he was engaged in."[7]  Id. at 54. We conclude that the District Court did not err when it applied this enhancement.

Fourth, Hoffecker contends that the District Court erred by applying a 4-level enhancement pursuant to U.S.S.G. § 2F1.1(b)(6) because the offense affected a financial institution and he derived more than one million dollars in gross receipts from the offense. Hoffecker does not dispute that he derived more than one million dollars from the offense, but he claims that Amitex was not a "financial institution" because it was a sham company with no legitimate business.

There is little case precedent addressing the issue of whether an entity which is alleged to be the vehicle of the fraud can constitute a "financial institution" for purposes of the Sentencing Guidelines. The Guidelines Commentary defines "financial institution" to include a "any state or foreign bank, . . . credit union, . . . investment company, . . . and any similar entity, whether or not insured by the federal government." U.S.S.G. § 2F1.1 cmt. n.14.

Two other courts of appeals have concluded that the enhancement will apply when the fraud affected a financial institution that was itself the vehicle for the fraud. The Court of Appeals for the Seventh Circuit in United States v. Collins concluded that "when it walks and talks like a financial institution, even if it is a phony one, it is . . . covered by § 2F1.1(b)(6)." 361 F.3d 343, 348 (7th Cir. 2004) (quoting United States v. Randy, 81 F.3d 65, 69 (7th Cir. 1996) (emphasis in original)); see also United States v. Dale, 374 F.3d 321, 328 (5th Cir. 2004), vacated on other grounds, 543 U.S. 1113, 125 S.Ct. 1067 (2004) (agreeing with Collins decision that an illegitimate financial institution constitutes

---

[7]Of course, Hoffecker's activities here involved precious metals, the subject of the injunction, but went beyond such items.

a financial institution for purposes of section 2F1.1(b)(6)). In Collins, the defendant had incorporated a sham investment company and fraudulently used it as a conduit to raise millions of dollars from victim investors. 361 F.3d at 344. On appeal, he argued that a financial institution created solely for the purpose of defrauding investors cannot be considered a victim of a scheme to defraud. Id. at 347. The court of appeals pointed out that the defendant's company "was fraudulently held out to investors as a financial company that offered the opportunity to invest in high-return, zero-risk investments. . . . [It] utilized a network of 'employees' to draw over 400 unwitting investors into the scheme, accumulating millions of dollars in receipts, all of which would eventually be siphoned out of the company by the company's president and owner." Id. at 348. Thus, the company "walked and talked" like the financial institution it purported to be. Id. The court found support for its decision in the Sentencing Commission's

> expansive interpretation of what it means to substantially jeopardize the safety and soundness of a financial institution. . . . [T]he Commission interprets § 2F1.1(b)(6) broadly, to cover threats to the fiscal security of a corporation as well as the loss of individual investments. Because the Sentencing Commission extends the protections of § 2F1.1(b)(6) beyond institutions to individual investors, it follows that the Commission would intend the guideline to apply to conduct that victimizes both legitimate and fraudulent corporations. In both cases investors lose their investment due to fraudulent conduct. It makes no difference to individual investors in the present case whether [the defendant] stole their money from a legitimate corporation or one created for fraudulent purposes; the important fact to the investors is that their investments will not be repaid.

Id.

One district court has disagreed with the Court of Appeals for the Seventh Circuit's interpretation of this enhancement. United States v. Sirotina, 318 F. Supp. 2d 43, 45-48 (E.D.N.Y.

2004). In <u>Sirotina</u>, the court reviewed the legislative history of the enhancement, which proceeded as follows: after the 1980s savings and loan crisis, Congress directed the Sentencing Commission to "provide for a substantial period of incarceration" for certain offenses that "substantially jeopardize[] the safety and soundness of a federally insured financial institution," <u>id.</u> at 45 (quoting Pub. L. No. 101-73, 103 Stat. 183, 501 (1989)); in response, the Commission drafted section 2F1.1(b)(6) – known as (b)(8) in the 2000 version of the Guidelines, which the <u>Sirotina</u> court was using – which implemented the law in a broader form by expanding the definition of "financial institutions" beyond federally insured financial institutions to uninsured financial institutions. After reviewing this history, the court stated that

> the guideline was aimed at imposing additional punishment for conduct that results in the destruction of legitimate organizations, such as the savings and loan associations that were pilfered in the 1980s. In expanding the definition of 'financial institutions,' all the Sentencing Commission did was to include a broader array of legitimate entities subject to protection. There is no basis to conclude that the Commission chose to ignore the goal of [Congress's] directive and included sham organizations within the umbrella of covered institutions, thereby placing the victim and victimizer on equal footing.

<u>Id.</u> at 46. The court then reasoned that "[w]hen a legitimate institution is brought to its knees by fraud perpetrated on it, there is a ripple effect greater than the loss to the individual investors. To apply this guideline not to the victim but to the perpetrator makes no sense." <u>Id.</u> The court continued:

> Nothing in the definition of 'financial institution' in Application Note 19 suggests that it was meant to apply to an organization whose raison d'être is to perpetrate fraud. <u>See</u> U.S.S.G. § 2F1.1, cmt. n. 19 (2000). When the Commission intends to apply a guideline to both legitimate and fraudulent activities, it knows how to do so. For example, in U.S.S.G. § 3B1.3, the Commission drafted a guideline that

94

imposes a two-level enhancement for someone who abuses a position of trust. In 1998, long after the definition of 'financial institution' was added to the Guidelines, the application note to the abuse of trust provision was amended to clarify that the guideline applied both where a defendant actually holds a position of trust and where he or she pretends to do so. Id. § 3B1.3, cmt. n. 2 ('This adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not.'). No similar change was made to the application notes interpreting 'financial institutions' in § 2F1.1(b)(8) to reflect its application to sham entities. Certainly, had the Sentencing Commission intended for the definition of 'financial institution' to encompass a fraudulent one, it would have made plain such an unorthodox application of an ordinary term.

Id. at 46-47. The court then stated that:

the Seventh Circuit's analysis [in Collins] misconstrues the guideline. It is of course true that investors in both legitimate and illegitimate corporations suffer losses as a result of fraud. One can steal from a legitimate organization and cause losses to investors, or one can create a sham company and effect the same injury. The harm caused by the money lost, however, is covered by a different guideline provision, § 2F1.1(b)(1). . . . The threat to which § 2F1.1(b)(8) is directed is not the victim losses per se but to the separate harm caused by the destruction of a viable legitimate organization – a harm that is not necessarily congruent with investor losses. Application Note 19 addresses the damage to the entity itself, not the injury to the defrauded individuals. When viewed from the perspective of harm to the institution, the purpose of the guideline would not be served by punishing defendants for the destruction of a vehicle

95

of fraud, which itself served no public good.

Id. at 47-48.  Accordingly, the court concluded that the Sentencing Commission did not intend for the 4-level enhancement to apply when a fraud affected a "sham" institution that was itself the vehicle for the fraud.  Id. at 48.

For several reasons, we disagree with the court's reasoning in Sirotina and we agree with the Courts of Appeals for the Fifth and Seventh Circuits that the 4-level enhancement applies when a fraud affects a financial institution that acted as the vehicle for the fraud.  First, it does not make sense that the Congress or the Sentencing Commission would seek to punish more severely a person who controlled an institution that was legitimate than a person who had controlled a sham institution.  One would think that the criminal running a completely fraudulent financial institution is more deserving of the harsher sentence.  The "ripple effect" that the Sirotina decision acknowledges happens when an institution "is brought to its knees by fraud" is the same whether the institution is legitimate or a sham – in either circumstance, the damage is greater than the loss to the individual investors.  In addition, the Sentencing Commission's background commentary for section 2F1.1 supports the conclusion that the definition of "financial institutions" includes sham institutions that hold themselves out as legitimate:

> This guideline is designed to apply to a wide variety of fraud cases.  . . .  Empirical analyses of pre-guidelines practice showed that the most important factors that determined sentence length were the amount of loss and whether the offense was an isolated crime of opportunity or was sophisticated or repeated.  Accordingly, although they are imperfect, these are the primary factors upon which the guideline has been based.

U.S.S.G. § 2F1.1 cmt. background.  This comment suggests that an offender that uses a sham financial institution to commit his fraud is engaging in a "sophisticated" crime and thus should be subject to the enhancement.  Moreover, there is nothing in the guideline to suggest that the Commission intended to limit the enhancement

only to apply to legitimate financial institutions; we will not read that limitation into the language of the guideline. Finally, we think it would be difficult for courts to distinguish between a financial institution that solely functioned as a vehicle for the fraud and one that was at least partially legitimate. Accordingly, we conclude that section 2F1.1(b)(6) applies to a fraud that affected a financial institution that was itself the vehicle for the fraud.

> In this case, the District Court found that:

> Amitex clearly held itself out in its literature as a financial institution. It sought to engender customer confidence in the loan scheme. . . . [It] was [held out as] this separate financial institution that would in fact make the initial investment mean oh so much more and the return oh so much greater because of the ability to obtain a loan on and buy much more of the commodities than the investment would otherwise have covered.

App. vol. 55 at 56. "The use of the apparent financial institution framework was effective and integral to the program this jury has determined was a fraud." Id. at 63. Thus, Amitex "walked and talked" like a financial institution. Moreover, the evidence demonstrated that Hoffecker derived far more than one million dollars in gross receipts from the offense. In these circumstances, the District Court did not err when it applied the enhancement to increase Hoffecker's offense level by 4 levels.

Fifth, Hoffecker argues that the District Court erred when it applied a 2-level enhancement to his offense level pursuant to U.S.S.G. § 3A1.1(b) because he knew or should have known that the victims of the offenses were unusually vulnerable or otherwise particularly susceptible to criminal conduct by virtue of their naiveté. The District Court found that the victims were unsophisticated and without expertise:

> These were folks whose naiveté was used as a basis for getting them to invest both at the beginning and again and again. And the government has proven through the reloading factor alone that is a link

among many of the victims' testimony that the defendants viewed them as susceptible . . . . And that they lost money as a result of that exploitation of their susceptibility.

App. vol. 55 at 65. Though we see no reason why the term could not be used to describe repeated legitimate solicitations, we are dealing here with a fraud case where "the repeated targeting of [the] victim, a practice called 'reloading,' constitutes evidence that the defendant knew the victim was particularly vulnerable to the fraud scheme." United States v. Day, 405 F.3d 1293, 1296 (11th Cir. 2005). Thus, the District Court's use of the term "reloading"[8] was entirely appropriate. In these circumstances, we conclude that the District Court did not err when it applied the 2-level "vulnerable victim" enhancement to Hoffecker 's offense level.

Sixth, Hoffecker contends that the District Court erred by applying a 2-level enhancement because he "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense . . . ." U.S.S.G. § 3B1.3. We apply a three-part test to determine whether a defendant occupied a position of trust: "(1) whether the position allows the defendant to commit a difficult to detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position." United States v. Hart, 273 F.3d 363, 376 (3d Cir. 2001) (citation and quotation marks omitted).

In this case, the District Court found that Hoffecker was a "highly intelligent man, highly skilled and experienced in this market," abilities which allowed him to commit a wrong that was difficult to detect. App. vol. 55 at 67. Second, Hoffecker derived a great degree of authority from his position vis-à-vis the victims

---

[8]"Reemptying" might be a better term than "reloading." On the other hand, perhaps what would be appropriate is to make selection of the term used from the point of view of the swindler or the victim, as the case may be, as the swindler is being reloaded but his victims are being reemptied.

of his crime. He was vested with authority to coordinate a fraud that employed intentionally misleading sales scripts and boiler-room pressure tactics to defraud investors. He also exercised the authority to hire and train the employees he needed to carry out his scheme. Third, the District Court concluded that Hoffecker had erected a "shield" by training and using "an efficient and highly effective sales force" "as the vehicle of gaining the reliance of these victims." Id. at 68. The court also pointed to the brochures distributed to victims that falsely promoted Amitex's 25 years of experience and offices in London, Monaco, and Munich. The court reasoned that "[a]ll of this effort to promote the viability [of the scheme] and engender victim reliance . . . cannot be swept aside . . . ." Id. at 69. The court concluded that "the abuse of trust is all part and parcel of that deliberate effort that the jury found in convicting the defendants of this fraud, to create a contrived but nonetheless apparently sound investment opportunity that was in fact fraudulent to the core as found by this jury." Id. at 70. In these circumstances, we conclude that the District Court did not err in applying the 2-level enhancement to Hoffecker's offense level for abusing a position of trust.

Hoffecker next argues that the District Court did not give meaningful consideration to the section 3553(a) factors when it imposed his 210-month sentence of incarceration.

The section 3553(a) factors that a district court must consider are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for – (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;

(5) any pertinent policy statement . . . issued by the Sentencing Commission . . .;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

There is ample evidence that the District Court considered the section 3553(a) factors in imposing sentence. In particular, the court stated:

Mr. Hoffecker told me today that everybody knows that commodities are risky. And the fact is, that what was sold this jury found was not risk but utter and complete ruin to anyone who gave one dollar. . . . The calculated life plan that Mr. Hoffecker engaged in was persistent fraud. Fraud against many, many people who lost much much money . . . .

App. vol. 55 at 120-21. The court continued:

[F]rom his own remarks as revealed in the secretly recorded conversations, Mr. Hoffecker does not have respect for the law. There are the comments regarding the fact that the Department of Justice could not pierce the veil, could not provide regulatory oversight. There are the injunctions. There's the history of litigation between Mr.

100

Hoffecker and the regulatory agencies. . . . And to the extent that a sentence must promote respect for the law and provide just deterrence, I don't believe that the guideline level of 210 months is a punishment more severe than is necessary. . . . Nothing has deterred Hoffecker. Nothing until now. I can't take seriously the remark that he doesn't know how all of this happened. It happened because he is exceeding[ly] good at what he does or did. He was a lot smarter than a lot of the government regulators and he figured out how to dodge and weave and interstitially get a scheme that this jury found was fraudulent. . . . [T]he program was a scam. . . . And therefore, incapacitation for a considerable period of time is truly the only reasonable way for a sentencing judge to approach those issues.

App. vol. 55 at 123-26. Beyond these statements, the District Court considered at remarkable length all of the section 3553(a) factors at the sentencing hearing. The transcript of the hearing, stretching over 135 pages, reflects a careful and thorough consideration of section 3553(a) in all its aspects.

We find that the District Court gave meaningful consideration to the section 3553(a) factors. Accordingly, we conclude that the District Court's sentencing decisions were procedurally sound.

We next consider, under an abuse of discretion standard, whether Hoffecker's sentence of 210 months was substantively reasonable. Gall, 128 S.Ct. at 597. In conducting this analysis, "[t]he question is not . . . what sentence we ourselves ultimately might have decided to impose on the defendant. We are not sentencing judges. Rather, what we must decide is whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth in section 3553(a)." United States v. Cooper, 437 F.3d 324, 330 (3d Cir. 2006) (quoting United States v. Williams, 425 F.3d 478, 481 (7th Cir. 2005)).

Hoffecker contends that the sentence was unreasonable considering that he "never before transgressed the boundaries of the law," "committed his life in service to others," and was "singled out as the person responsible for investors losing money in admittedly high risk ventures . . . ." Appellant's Rep. Br. at 64-65.

We disagree with Hoffecker that his sentence was substantively unreasonable. Taken as a whole, and given the deferential standard with which we review sentencing determinations, we find the District Court's sentence was consistent with the factors set forth in section 3553(a) and was substantively reasonable. In light of the seriousness of his offenses, the number of victims, the staggering amount of money taken, his utter disrespect for the law and refusal to acknowledge his transgressions, and the fact that nothing – including a permanent injunction – deterred him from operating the scam, we cannot conclude that the District Court abused its discretion when it imposed a sentence at the bottom of the advisory Guidelines range. Surely it was necessary in the words of section 3553(a) to separate Hoffecker from society for a long period "to protect the public from further crimes of the defendant."

Hoffecker's attempt to characterize his victims' losses as nothing more than the result of their lack of success "in admittedly high risk ventures" is really quite extraordinary as their losses were the product of his scam rather than of the operation of the marketplace. Moreover, it is clear that the District Court took Hoffecker's arguments for leniency into account when it fashioned his sentence. Although we do not deem a within-Guidelines sentence presumptively reasonable, it is "more likely to be reasonable than one that lies outside the advisory guidelines range." Cooper, 437 F.3d at 331. This sentence was, if anything, on the low side of the range of reasonable sentences.

## IV. CONCLUSION

In closing we think that it is appropriate to comment on the District Court's management of this long and difficult case. The

court was required to deal with many complex issues and did so with great patience and skill and ensured that Hoffecker and Myers received fair trials. Our obligation to review this case in the uncharged atmosphere of our chambers has been difficult enough but really pales when compared to the District Court's burden to make ruling after ruling in the difficult circumstances facing it when managing the complex and highly contested jury trial here. The court's efforts should not go unnoticed and they have not been. The amended judgment of conviction and sentence entered July 24, 2006, will be affirmed.